NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ETHEL MITCHELL *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>KENVUE, INC., and JOHNSON & JOHNSON CONSUMER INC.,<br><br>                    Defendants. | Civil Action No. 24-4109 (GC) (JBD)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendants Kenvue, Inc. and Johnson & Johnson Consumer Inc. (Johnson & Johnson)'s Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (ECF No. 59) pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(1) and 12(b)(6).  (ECF No. 60.)[1]  Plaintiffs opposed the Motion, and Defendants replied.  (ECF Nos. 63, 65.)  Defendants also filed five Notices of Supplemental Authority, and Plaintiffs responded to the third Notice.  (ECF Nos. 66, 69, 70, 72, 76, 77.)  Plaintiffs filed their own Notice of Supplemental Authority.  (ECF No. 74.)  The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendants' Motion is **GRANTED**.

---

[1]    Plaintiffs are Alan Montenegro, Melissa Medina, Brenda Morgan, Cheryl Powers, Jenny Qu, Daniel Feldtkeller, Leslie LaMay, Kayleigh Schenider, Verunika Dujmovic, Abdallah Al-Qudsi, Marilyn Saavedra, Johne Conte, Starnella Harder, Alexandra Donato, Joseph Long, Noah Long, Robin Corey, Daniel Calzado, Ethel Mitchell, Annette Haggerty, Paulette Williams, Ashly Jones, and Basim Johnson.  (ECF No. 59 ¶¶ 8-30.)

## I.    BACKGROUND

### A.    Factual Background[2]

Defendant Johnson & Johnson, a citizen of Delaware with its principal place of business in New Jersey, sells benzoyl peroxide (BPO) acne treatment products under the brand names Clean & Clear and Neutrogena.  (ECF No. 59 ¶¶ 1, 33.)[3]  Defendant Kenvue, Inc. is a subsidiary of Johnson & Johnson and "shares responsibility for consumer health products including brands Clean and Clear and Neutrogena." (*Id.* ¶ 34.)[4]  Plaintiffs reside in eleven states, and each Plaintiff purchased at least one of Defendants' BPO products.  (*Id.* ¶¶ 1, 8-32.)[5]  Those BPO products include Clean & Clear Continuous Control Acne Cleanser; Clean & Clear Persa-Gel® 10; Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash; Neutrogena Rapid Clear Stubborn Acne Spot Gel; Neutrogena Stubborn Acne AM Treatment; Neutrogena Stubborn Marks

---

[2]    On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted).

[3]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[4]    In a footnote, Defendants argue Kenvue, Inc. should be dismissed from this action because "Plaintiffs' allegations lump[] [both Defendants together] and misrepresent[] [Kenvue, Inc.'s] relationship with Johnson & Johnson, a company with which Defendants have no current affiliation." (ECF No. 60-1 at 12 n.1).  The Court will not dismiss Kenvue, Inc. for these reasons at this early stage. *See McMahon v. Volkswagen Aktiengesellschaft,* Civ. No. 22-1537, 2023 WL 4045156, at *10 (D.N.J. June 16, 2023) ("Though there are multiple entities involved, when these entities are intertwined through a complex corporate structure, plaintiffs cannot be expected to know the exact corporate structure and degree of each defendant's involvement at the motion to dismiss stage and prior to discovery.") (internal quotation marks and citations omitted) (alterations adopted).  To the extent Defendants also request Johnson & Johnson Consumer Inc. be replaced with Kenvue Brands LLC—the subsidiary of Kenvue, Inc.—the Court is not persuaded substitution at this time is appropriate. (*See* ECF No. 60-1 at 12.)  Defendants may file a separate motion to substitute.

[5]    Plaintiffs reside in California, Connecticut, Illinois, Maryland, Missouri, Nevada, New York, Ohio, Pennsylvania, Texas, and Washington.  (ECF No. 59 ¶¶ 8-30.)

PM Treatment; Neutrogena On-the-Spot Acne Treatment; and Neutrogena Clear Pore Cleanser/Mask. (*Id.* ¶¶ 1 n.1, 8-32.) Plaintiffs allege that because BPO naturally degrades into benzene, "under normal storage and transport conditions," all of the BPO products they purchased contain benzene, a known human carcinogen. (*Id.* ¶¶ 1, 8.) Defendants did not disclose that these products contain benzene or that the BPO in the products degrade into benzene. (*Id.* ¶¶ 7-8.) Plaintiffs allege they would not have purchased these products, or paid less for them, had this information been disclosed. (*Id.* ¶ 31.)

### 1.    *The BPO Products and the Danger of Benzene*

The products at issue are each manufactured in the same way. (*Id.* ¶ 41.) Defendants mix BPO, a dry white powder, with other ingredients to create the topical creams, cleansers, scrubs, and washes used to treat acne. (*Id.* ¶ 42.) BPO constitutes up to 10% of the total composition of these products. (*Id.*) Defendants list the ingredients, including BPO, on the product labels, but the labels do not state that the products contain benzene or can degrade to form benzene. (*Id.* ¶ 70.) Instead, the labels warn users to, among other things, "avoid contact with the eyes, lips, and mouth," and "[p]rotect from excessive heat (40°C/104°F)[.]" (*Id.* ¶ 116.)

The health hazards of benzene have been recognized for over one hundred years. (*Id.* ¶ 46.) Plaintiffs allege that the scientific and regulatory communities agree that benzene is a well-known human carcinogen with severe consequences to human exposure. (*Id.*; *see also id.* ¶¶ 47-51, 58-60 (citing examples).) In response to reports of benzene contamination in various drug products, the United States Food and Drug Administration (FDA) published guidance on its website on December 27, 2023. (*Id.* ¶ 54; *see also id.* ¶¶ 73-75.) The guidance stated that "[d]rug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 [parts per million (ppm)]" and

"[i]f any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]")  (*Id.*)

Studies dating back to as early as 1936 have found that BPO degrades into benzene when exposed to heat over time.  (*Id.* ¶¶ 104-110.)  In 2024, studies connected this finding to BPO acne products in particular.  On March 5, 2024, Valisure LLC submitted a Citizen Petition to the FDA requesting a suspension of sales and recall of BPO acne products from the U.S. market based on its findings that numerous BPO acne products contained elevated levels of benzene.  (*Id.* ¶ 62.)[6] Valisure is a company that operates an "analytical laboratory" and is registered with the Durg Enforcement Administration.  (*Id.* ¶ 63.)  It reported analyzing sixty-six acne drug products, both prescription and over-the-counter (OTC), that contained BPO.  (*Id.* ¶¶ 43, 67.)  Valisure incubated each of the products at 122°F and measured samples at various intervals across an 18-day period. (*Id.*)  Valisure noted 122°F was a reasonable temperature because it is "an accepted incubation temperature used by the pharmaceutical industry" and is a temperature that "the product may be exposed to during distribution and handling by consumers."  (*Id.* at 37 n.42.)  Plaintiffs allege that the study revealed that each of the sixty-six products, including Defendants' BPO products, contained benzene.  (*Id.* ¶¶ 43, 67.)  Based on its study, Valisure concluded that "[o]n-market formulations of BPO containing acne treatment products tested by Valisure appear to be fundamentally unstable and generally form unacceptably high levels of benzene."  (ECF No. 60-2 at 47.)  Most Plaintiffs purchased a type of Neutrogena BPO acne treatment product for which

---

[6]    The Court may consider the Valisure Citizen Petition, (ECF No. 60-2), because it is an "undisputedly authentic document that [D]efendant[s] attach[] as an exhibit to a motion to dismiss [and Plaintiffs'] claims are based on the document."  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993); *see also, e.g.*, *Navarro v. Walgreens Boots All., Inc.*, Civ. No. 24-00290, 2025 WL 1411406, at *2 n.1 (E.D. Cal. May 15, 2025) ("Plaintiffs have unambiguously incorporated Valisure's [C]itizen [P]etition into the first amended complaint."), *report and recommendation adopted*, 2025 WL 3485004 (E.D. Cal. Dec. 4, 2025).

Valisure testing revealed benzene levels surpassing 2 ppm.  The remainder of the Plaintiffs purchased (1) Clean & Clear BPO acne treatment products for which Valisure testing revealed benzene levels below 2 ppm; or (2) Neutrogena or Clean & Clear BPO acne treatment products that Valisure did not test.  (*See* ECF No. 59 ¶¶ 1 n.1, 8-30; ECF No. 60-2 at 40.)  Apart from Valisure-specific testing, Plaintiffs further allege that their counsel purchased some of Defendants' BPO products for which independent testing showed benzene levels above 2 ppm.  (ECF No. 59 ¶ 69.)

On March 11, 2025, the FDA issued a recall of certain BPO products.  (*Id.* ¶ 55.)  The FDA concluded that a limited number of the tested products should be recalled at the retail level, meaning that retailers were instructed to remove the products from store shelves and online marketplaces, but consumers who had already purchased the products were not instructed to take action because "[e]ven with daily use of these products for decades, the risk of a person developing cancer because of exposure to benzene found in these products is very low."  (ECF No. 60-2 at 6.)  None of Defendants' BPO products purchased by Plaintiffs are listed in the FDA recall.  (*See id* at 6-8.)

### 2.    *The Regulatory Scheme*

The Federal Food, Drug, and Cosmetic Act (FDCA) and its implementing regulations set forth the requirements for the branding and selling of OTC drugs.  Plaintiffs allege Defendants violated four statutory or regulatory sources of FDCA authority: (1) the Acne Monograph; (2) the format and content labeling requirements; (3) Chapter V of the FDCA; and (4) current good manufacturing practices.[7]  (*See* ECF No. 59 ¶¶ 72, 78, 81-84, 89, 90, 92, 95, 120-127; *see also* ECF No. 63 at 15-26.)

---

[7]    The FDCA provides no private right of action, *see In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 788 (3d Cir. 1999), and contains a broad express preemption provision

a.      *Acne Monograph*

The FDCA regulates most OTC medications through a "monograph" process. A monograph is a set of regulations describing conditions under which certain drugs may be marketed without a prescription. *See* 21 C.F.R. § 330.10, *et seq.* "Like a recipe, each monograph sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs and provides the conditions under which each active ingredient is [generally recognized as safe and effective.]" *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 74-75 (2d Cir. 2013). "Any product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." 21 C.F.R. § 330.10(b).

There is a monograph specific to OTC acne products. In 2010, the FDA issued a "final rule to include [BPO] as a generally recognized as safe and effective . . . active ingredient in [OTC acne] topical drug products." (ECF No. 59 ¶ 82 (quoting 75 Fed. Reg. 9767, 9767 (March 4, 2010).) This monograph has been incorporated into the regulations. *See* 21 C.F.R. §§ 333.301-333.350 (Acne Monograph). The Acne Monograph expressly permits the use of BPO as an active ingredient in products in an amount of 2.5 to 10 percent. *Id.* § 333.310(a). The Acne Monograph also imposes labeling and warning requirements. For products that include BPO, the regulations outline specific warnings that must be included on labels, but there is no requirement to disclose the possibility of benzene. *See id.* § 333.350(c)(1), (4). Despite the FDA-issued guidance in 2023 on drug products containing benzene above 2 ppm and the 2025 recall, the Acne Monograph has not been changed.

---

applicable to the instant matter, 21 U.S.C. § 379r(a). Accordingly, whether Plaintiffs' Consolidated Class Action Complaint survives Defendants' Motion to Dismiss boils down to whether Plaintiffs plead a violation of any statutory or regulatory authority under the FDCA that has a parallel state law requirement. *See supra Section* III.B.

The Acne Monograph also provides that an "over-the-counter acne drug product . . . is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in [the Acne Monograph] and each general condition established in [21 C.F.R.] § 330.1." *Id.* § 333.301. In other words, in addition to the requirements specific to the Acne Monograph, Defendants must also adhere to the general requirements of 21 C.F.R. § 330.1. That section, in turn, sets forth three relevant requirements. First, the product must be "labeled in compliance with . . . the format and content requirements in [21 C.F.R.] § 201.66." 21 C.F.R. § 330.1(c)(1). Second, the product must also be "labeled in compliance with chapter V of the [FDCA.]" *Id.* Third, the product must be "manufactured in compliance with current good manufacturing practices, as established by parts 210 and 211 of this chapter." *Id.* § 330.1(a). Failure to comply with any of these requirements renders the product "liable to regulatory action." *Id.* § 330.1. The Court briefly turns to each of these three requirements.

### b.      Format and Content Labeling Requirements

Section 201.66 lists "[f]ormat and content" labeling requirements for OTC drugs. 21 C.F.R. § 201.66. In particular, the regulation mandates that active and inactive ingredients be listed on OTC drug labels. *Id.* § 201.66(c)(2), (c)(8).

### c.      Chapter V of the FDCA

Chapter V of the FDCA prohibits the sale of "adulterated" or "misbranded" drugs. 21 U.S.C § 331(a)-(b). A drug is "adulterated" if it "consists in whole or in part of any filthy, putrid, or decomposed substance," 21 U.S.C § 351(a)(1), or if "the methods used in, or the facilities or controls used for, [the drug's] manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice[s]," *id.* § 351(a)(2)(B). A drug is "misbranded" "[i]f its labeling is false or misleading in any particular."

*Id.* § 352(a)(1).  The labeling is "misleading" if it "fails to reveal facts . . . material with respect to consequences which may result from the use of the article to which the labeling or advertising relates . . . under such conditions of use as are customary or usual."  21 U.S.C § 321(n).

### d.      Current Good Manufacturing Practices

Current good manufacturing practices, known as cGMPs, "require OTC drug products meet safety, quality, purity, identity, and strength standards."  *Navarro v. Walgreens Boots All., Inc.*, Civ. No. 24-00290, 2025 WL 1411406, at *1 (E.D. Cal. May 15, 2025), *report and recommendation adopted*, 2025 WL 3485004 (E.D. Cal. Dec. 4, 2025).  Sections 210 and 211, in turn, outline the cGMPs.  For example, OTC drug manufacturers must have "a written testing program designed to assess the stability characteristics of drug products" and must use the results of stability testing to determine "appropriate storage conditions and expiration dates."  21 C.F.R. § 211.166(a).

### B.      Procedural Background

Shortly after Valisure submitted its Citizen Petition to the FDA on March 5, 2024, Plaintiffs Ethel Mitchell and Annette Haggerty filed a putative class action complaint.  (ECF No. 1.)  On April 28, 2025, the Court consolidated this case with two others originally filed in the United States District Courts for the Central District of California and the Western District of Missouri.  (ECF No. 53.)  On May 22, 2025, Plaintiffs filed the operative Consolidated Class Action Complaint.  (ECF No. 59.)  Plaintiffs seek to represent a multi-state class of "consumers who purchased Neutrogena and/or Clean & Clear [BPO] products in the United States of America and its territories from March 8, 2020 to the present for personal or household use within the applicable limitations

8

period." (*Id.* ¶ 137.)  In the alternative, Plaintiffs seek to represent a subclass of persons residing in their state.  (*Id.* ¶ 138.)[8]

In their eight count Consolidated Class Action Complaint, Plaintiffs bring claims for violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (Count I) and the Consumers Legal Remedies Act, Cal. Bus. & Prof. Code § 1750, *et seq.* (Count II); false advertising under various state statutes (Count III)[9]; deceptive trade practices under various state statutes (Count IV)[10]; breach of the implied warranty of merchantability (Count V); negligent misrepresentation or omission (Count VI); unjust enrichment (Count VII); and breach of express warranty (Count VIII).  (*Id.* ¶¶ 147-248.)[11]

Plaintiffs seek injunctive, declaratory, and monetary relief.  (*Id.* at 103-104.)  Plaintiffs seek an order (1) enjoining Defendants from selling the BPO products or suggesting that they are safe for human application and (2) requiring Defendants to engage in a corrective advertising campaign.  (*Id.* at 104.)  Plaintiffs also seek "an order awarding declaratory relief, and any further

---

[8]    Plaintiffs do not appear to seek a subclass of persons residing in Connecticut.  (ECF No. 59 ¶ 138.)

[9]    Plaintiffs cite the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*, and the New York General Business Law, N.Y. Gen. Bus. Law § 350, *et seq.*  (ECF No. 59 ¶¶ 180-181.)

[10]    Plaintiffs cite the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*; the Maryland Unfair or Deceptive Trade Practices Act, Md. Code Com. Law § 13-301, *et seq.*; the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407, *et seq.*; the Nevada Deceptive Trade Practice Act, Nev. Rev. Stat. § 598.0903, *et seq.*; the New York General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*; the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01, *et seq.*; the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*; the Texas Unfair Trade Practices and Consumer Protection Law, Tex. Bus. & Com. Code § 17.41, *et seq.*; and the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq*.  (ECF No. 59 ¶¶ 191-200.)

[11]    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1332(d)(2).

retrospective or prospective injunctive relief permitted by law or equity . . . ." (*Id.*)  Finally, Plaintiffs seek compensatory and punitive damages, restitution, and attorneys' fees.  (*Id.*)

## II.    LEGAL STANDARD

### A.    Rule 12(b)(1)

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject-matter jurisdiction on either facial or factual grounds.  *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction."  *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999).  In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents attached thereto, in the light most favorable to the plaintiff."  *Gould Elecs. Inc.*, 220 F.3d at 176.  "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists."  *Arosa Solar Energy Sys., Inc. v. Recom Solar*, LLC, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts."  *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).  The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist."  *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review."  *Hartig Drug Co.*, 836 F.3d at 268.  Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court

10

has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010 WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). "In evaluating whether a complaint adequately pleads the elements of standing," under a facial challenge to standing, "courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim: Court[s] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (alteration in original).

### B. Rule 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dirs. of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. &*

11

*Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In deciding a Rule 12(b)(6) motion, the court can only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

When claims sound in fraud, plaintiffs "must satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b)." *Burns v. Stratos*, No. 22-1319, 2023 WL 4014474, at *2 n.3 (3d Cir. June 15, 2023) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud[.]"); *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155-58 (3d Cir. 2014). This ordinarily requires a plaintiff who alleges fraud to "support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)); *accord Frederico*, 507 F.3d at 200 ("To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.").

III.    **DISCUSSION**

A.    **Standing**

Defendants bring a facial challenge, arguing Plaintiffs lack Article III standing because Plaintiffs do not establish that they purchased BPO products with benzene and instead rely on an "unsupported benefit of the bargain theory" under which Plaintiffs allege they never would have purchased the products, or would have purchased them for less, if Defendants warned about the products. (ECF No. 60-1 at 15, 37-38.) Defendants contend that Plaintiffs lack standing to pursue state consumer fraud claims for the same reason. (*Id.* at 40.) Defendants also argue that Plaintiffs lack standing to seek injunctive or declaratory relief. They argue "plaintiffs seeking injunctive relief cannot show an injury-in-fact where they are aware of the harm a product allegedly causes, and as such, will not purchase the product in the future." (*Id.* at 41.) And, according to Defendants, Plaintiffs lack standing for restitution or disgorgement of profits because they mention these forms of relief in only conclusory terms. (*Id.* at 42.)

Plaintiffs respond that they adequately allege a benefit-of-the-bargain theory, including that they plausibly allege they purchased products containing benzene. (ECF No. 63 at 27, 31). And Plaintiffs contend that Defendants' argument about standing to pursue specific forms of relief is premature because courts dismiss claims, not remedies, at the motion to dismiss stage. (*Id.* at 34.)

"Challenges based on the various justiciability doctrines . . . are properly brought under [Rule] 12(b)(1)." *Brill v. Velez*, Civ. No. 13-05643, 2014 WL 2926086, at *2 (D.N.J. June 27, 2014). Article III of the United States Constitution limits a federal court's jurisdiction to actual cases or controversies. U.S. Const., art. III, § 2, cl. 1. The doctrine of Article III standing is "an additional limitation on the federal judicial power derived from the case-or-controversy requirement," which prohibits courts from issuing "advisory opinions." *Lutter v. JNESO*, 86 F.4th 111, 123-25 (3d Cir. 2023). "The plaintiff, as the party invoking federal jurisdiction, bears the

13

burden of establishing" standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). To have standing, a plaintiff must "allege: 1) an injury in fact; 2) causation; and 3) redressability." *In re Liquid Aluminum Sulfate Antitrust Litig.*, Civ. No. 16-2687, 2017 WL 3131977, at *18 (D.N.J. July 20, 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff must establish standing "'for each claim that [it] press[es] and for each form of relief that [it] seek[s].'" *Lutter*, 86 F.4th at 124 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). When "all claims allege the same injury, it is proper for a Court to analyze each claim in one collective standing analysis." *Grodnick v. Johnson & Johnson*, Civ. No. 24-2616, 2024 WL 5056411, at *2 n.4 (D.N.J. Dec. 10, 2024). "Injury-in-fact is comprised of three sub-elements: (1) an invasion of a legally protected interest; (2) injury [that] is both concrete and particularized; and (3) injury [that] is actual or imminent, not conjectural or hypothetical." *Huertas v. Bayer US LLC*, 120 F. 4th 1169, 1174 (3d Cir. 2024) (internal quotation marks and citations omitted).

For the reasons outlined below, Plaintiffs have standing to pursue their claims for monetary damages and restitution but not injunctive or declaratory relief.

### 1. *Monetary Damages*

One way "a plaintiff might successfully plead an economic injury" to satisfy the injury-in-fact requirement is "by alleging that she bargained for a product worth a given value but received a product worth less than that value." *In re Johnson & Johnson, Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283 (3d Cir. 2018). "This is known as the benefit-of-the-bargain theory of injury." *Huertas*, 120 F.4th at 1174. Under this theory, "[t]he economic injury is calculated as the difference in value between what was bargained for and what was received." *Johnson & Johnson*, 903 F.3d at 283. To establish injury-in-fact for monetary damages under a benefit-of-the-bargain theory, Plaintiffs must plausibly allege that (1) the products with the

14

asserted defect were worth less than products without the defect and (2) Plaintiffs purchased products that were in fact defective. *See Huertas*, 120 F. 4th at 1175-78.

>    a.    *Whether Plaintiffs Plausibly Allege that BPO Products with Benzene are Worth Less than BPO Products without Benzene*

In *Huertas*, plaintiffs brought a putative class action alleging they purchased benzene-contaminated Lotrimin and Tinactin spray products used to treat skin infections and sought damages under various state law causes of action. *Id.* at 1172-73. The defendant brought a facial challenge contesting that the plaintiffs alleged an injury-in-fact. *Id.* at 1174 & n.7. The plaintiffs argued they had standing under a benefit-of-the-bargain theory because they "bargained for an antifungal product free of contaminants and dangerous substances but instead received products that were unmerchantable and unfit for use as they [were] adulterated and contain[ed] harmful levels of benzene, [which] rendered their products worthless." *Id.* at 1175 (internal quotation marks and citations omitted.) The Third Circuit concluded that "products that are unusable due to . . . contamination are necessarily worth less than the product when properly manufactured." *Id.* Based on this conclusion, which required "little elaboration," the Third Circuit found the plaintiffs plausibly alleged that the contaminated products containing benzene were worth less than the uncontaminated products plaintiffs thought they were purchasing. *Id.* at 1175, 1177-78.

The facts here are similar. Plaintiffs allege they "spent money to purchase BPO [p]roducts they would not otherwise have purchased, or paid less for, absent Defendants' misconduct." (ECF No. 59 ¶ 31.) Plaintiffs allege Defendants' BBO products are contaminated with benzene based on the 2024 Valisure study as well as other independent testing. (*Id.* ¶¶ 62-69.) These benzene-containing products, Plaintiffs allege, were "worthless." (*Id.* ¶¶ 6, 98, 134). Under *Huertas*, Plaintiffs have plausibly alleged Defendants' benzene-containing acne products are worth less than acne products not containing benzene.

> b.     *Whether Plaintiffs Plausibly Allege They Purchased Defective Products*

"Having determined that Plaintiffs have plausibly alleged economic injury," the Court "must still determine whether they sufficiently alleged that *their* products"—*i.e.*, Plaintiffs' purchased products—"contained benzene." *Huertas*, 120 F. 4th at 1178 (emphasis in original). "Otherwise, their claim that they purchased a product worth less than the product for which they bargained necessarily fails, and they are not entitled to relief under the benefit-of-the-bargain theory." *Id.* For the reasons described below, the Court finds Plaintiffs have sufficiently alleged that they purchased benzene-containing products, so they have standing to pursue claims for monetary damages.

In *Huertas*, the Third Circuit examined whether the plaintiffs plausibly pled that the sprays they bought contained benzene. The plaintiffs relied on two events. First, the plaintiffs alleged that in October 2021, the defendant voluntarily recalled certain Lotrimin and Tinactin spray products after discovering samples of those products contained benzene. *Id.* at 1172. The defendant recalled spray products "with lot numbers beginning with TN, CV, or NAA" that were distributed between September 2018 and September 2021. *Id.* Second, shortly after the recall, the plaintiffs alleged Valisure tested thirteen samples of recalled Lotrimin and Tinactin products and found twelve—all with lot numbers beginning with TN—contained detectable benzene levels and all but one of those samples' levels exceeded the FDA guideline limit. *Id.* at 1172-73. The plaintiffs alleged they purchased the spray products during the recall period, but only four of the nine plaintiffs purchased from lot numbers specified in the recall. *Id.* at 1173.

The district court dismissed the plaintiffs' complaint with prejudice for lack of standing. *Id.* The Third Circuit reversed, finding the district court's "reasoning was flawed" with respect to the district court's requirement that the plaintiffs allege "all of the representative products

16

contained benzene." *Id.* at 1178-79. *Huertas* made clear that "[p]laintiffs need only plausibly allege that they purchased contaminated products. This does not require a showing that *all* products in the recall were contaminated." *Id.* (emphasis in original) (first citing *In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, 97 F.4th 525, 529-30 (7th Cir. 2024) (suggesting that injury is adequately particularized when "contamination of . . . products was sufficiently widespread to plausibly affect any given [product], including the ones [plaintiffs] purchased"); and then citing *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 734-36 (2d Cir. 2017) (holding injury was plausibly alleged when third-party testing revealed challenged mislabeling practices were "systematic" and "routine")). The Third Circuit remanded the case to the district court with respect to the plaintiffs who purchased products from the TN, CV, or NAA lot numbers "to apply the plausibility standard." *Id.* at 1181.[12] However, "because neither the recall itself, nor the Valisure testing . . . have any relevance to [p]laintiffs who have failed to allege a TN, CV, or NAA lot number," the Third Circuit concluded the district court "properly dismissed [those specific plaintiffs'] claims for lack of standing." *Id.*

Here, Defendants' arguments that Plaintiffs failed to plausibly allege they purchased defective products are unpersuasive. First, Defendants contend that Plaintiffs do not "allege that they purchased the same batch or lot number as the products tested." (ECF No. 60-1 at 39.) But this argument extends the reasoning in *Huertas* too far. Unlike in *Huertas*, this is not a case about a specific batch gone awry from external contamination but rather concerns a problem inherent to

---

[12]   While the case was on appeal, the defendant filed a complaint in a separate action against the manufacturer of the component in Lotrimin and Tinactin that was contaminated with benzene to recover costs associated with the recall. *Huertas v. Bayer US LLC*, 120 F. 4th 1169, 1179 (3d Cir. 2024). The plaintiffs argued that complaint provided further evidence of the widespread nature of the contamination. *Id.* at 1179-80. The Third Circuit instructed the district court, on remand, to consider any motion for leave to amend so that the plaintiffs could incorporate additional allegations into their amended pleading. *Id.* at 1181.

17

each product that contains BPO. (*See* ECF No. 60-2 at 30 (Valisure Citizen Petition stating "the specific problem with benzene in [BPO] products does not appear to be a contamination issue from a specific ingredient, but instead the inherent instability of the [BPO] molecule that breaks down and forms benzene."). *See also Huertas*, 120 F.4th at 1179 (citing *John*, 858 F.3d at 734-36, approvingly for notion that "systematic" problem supports plausibility of injury). Valisure tested Defendants' Neutrogena and Clean & Clear BPO products and those products contained benzene, including some at levels that exceeded the FDA guideline limit. (ECF No. 60-2 at 40.) And, as Plaintiffs allege, each of Defendants' BPO products "are manufactured in the same manner." (ECF No. 59 ¶ 41.) Thus, "by virtue of their 'same' manufacturing"—and in particular the allegedly instable BPO ingredient—"[Defendants'] BPO products are sufficiently comparable" to the ones Plaintiffs actually purchased "to infer—at least at this motion-to-dismiss stage—that this result would have held across the [Neutrogena and Clean & Clear] BPO acne treatment product line." *In re Target Corp. BPO Sales & Marketing Litig.*, Civ. No. 24-1323, 2026 WL 145824, at *5 (D. Minn. Jan. 20, 2026). In other words, it is plausible that the Neutrogena and Clean & Clear products Plaintiffs purchased—even if Valisure did not test those specific brands of Neutrogena or Clean & Clear products, as is the case for a minority of the Plaintiffs—"manifested the alleged defect." *Id.*

Defendants next argue that Valisure heated the BPO products, but Plaintiffs do not allege that the products they purchased were likewise heated. (ECF No. 60-1 at 39-40.) While Defendants are correct, they ignore Plaintiffs' allegation that the products were heated to "perform[] accelerated stability studies" and at a temperature to replicate standard distribution and handling conditions by consumers. (ECF No. 59 at 37 n.2.) In other words, drawing all inferences in Plaintiffs' favor as the Court must, Plaintiffs allege Valisure used a standard procedure to

18

replicate the degradation of BPO into benzene over the course of the tested products' shelf life. Other courts that have addressed this argument—in the context of other BPO products in the Valisure study—have found similarly. *See, e.g.*, *Target Corp.*, 2026 WL 145824, at *5 ("Valisure's incubation testing replicated real-world distribution and consumer-handling conditions and was consistent with pharmaceutical industry testing standards."); *Howard v. Alchemee*, LLC, Civ. No. 24-01834, 2024 WL 4272931, at *4 (C.D. Cal. Sep. 19, 2024) ("Plaintiffs allege that. . . BPO degrades to benzene under normal conditions . . . .").

And regardless of the incubation testing, the Valisure study demonstrates that each of Defendants' Neutrogena and Clean & Clear products in the study had some level of benzene on day 0, before the incubation took place.  (*See* ECF No. 60-2 at 40.)  *See also Target Corp.*, 2026 WL 145824, at * 5 ("As Valisure explained in its Citizen Petition, Valisure found 'native benzene' present in 94 of the 99 products it tested . . . including all three Up&Up products Valisure tested.") (citations omitted).  "In other words, even without the high-temperature incubation testing Valisure performed, every [Neutrogena and Clean & Clear] BPO product it tested contained benzene." *Target Corp.*, 2026 WL 145824, at *5.  And, as alleged by Plaintiffs, any amount of benzene renders a BPO acne treatment product unsafe.  (ECF No. 59 ¶¶ 46, 48.)

Defendants argue that trace amounts of benzene should not confer standing.  (ECF No. 60-1 at 38-39 (first citing *Kimca v. Sprout Foods, Inc.*, Civ. No. 21-12977, 2022 WL 1213488 (D.N.J Apr. 25, 2022)); and then citing *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257 (3d Cir. 2010).) If Defendants were correct, then Plaintiffs who purchased Clean & Clear products would not have standing because the Valisure study—regardless of incubation—only found benzene levels in those products below the FDA 2 ppm guideline limit.  (*See* ECF No. 60-2 at 40.)  The Court finds

19

Defendants' pre-*Huertas* cases distinguishable and finds both *Huertas* and the BPO acne treatment cases more instructive.

In *Kimca*, the plaintiffs argued that they were misled into purchasing baby food products with "elevated levels of heavy metals," and alleged the levels were elevated based on "accepted standards." *Kimca*, 2022 WL 1213488, at *6. The court found these allegations insufficient because it was "not clear that the 'accepted standards' identified in the [complaint were] applicable to *baby food*" as the plaintiffs alleged metal limits for *water* only. *Id.* (emphasis added). Similarly, in *Koronthaly*, the Third Circuit found a plaintiff did not have standing to pursue a claim based on lead found in the plaintiff's lipstick. *Koronthaly*, 374 F. App'x at 258-59. There, the plaintiff alleged she suffered a concrete injury because "the lipstick contain[ed] lead in far greater amounts than permitted in candy by the FDA." *Id.* at 258. But her allegations were "belied by the FDA's report finding that the lead levels in [the defendants'] lipsticks were not dangerous." *Id.* at 259. With nothing more, the Third Circuit "asserted only a subjective allegation that the trace amounts of lead in the lipsticks [were] unacceptable to her, not an injury-in-fact sufficient to confer Article III standing." *Id.*

Here, Plaintiffs' allegations are more tailored. For example, citing the World Health Organization, Plaintiffs allege that "[b]enzene is a genotoxic carcinogen in human and *no safe level of exposure* can be recommended." (ECF No. 59 ¶ 46 (emphasis added).) And Plaintiffs cite an author of the Valisure study who states that "I want to reiterate first and foremost that there is not a safe level of benzene that can exist in any skin care product, over the counter or prescription." (*Id.* ¶ 48.) These allegations correspond to the thrust of *Huertas*, which focuses on plausibly alleging the presence—not level—of benzene. *See, e.g.*, 120 F. 4th at 1178 (stating a plaintiff must "sufficiently alleg[e] that their products . . . contained benzene") (emphasis omitted). And the

20

other acne BPO cases have found similarly.  *See Target Corp.*, 2026 WL 145824, at *5 (finding standing when plaintiffs alleged "that any amount of benzene renders a BPO acne treatment product defective"); *id.* ("Plaintiffs' primary theory is that any amount of benzene renders a BPO acne treatment product defective. Plaintiffs allege facts plausibly showing that benzene was present in every tested Up&Up BPO acne treatment product at day 0, before Valisure conducted its high-temperature incubation testing."); *Howard*, 2024 WL 4272931, at *3 (finding standing when "the thrust of [p]laintiffs' complaint is that, because of the inherent propensity of BPO to degrade into benzene under 'normal use, handling, and storage' conditions, all acne products with BPO are unsafe because they essentially all contain benzene, and any amount of benzene is dangerous.")  Thus, the Court finds Plaintiffs need not have alleged Defendants' BPO products contained higher levels of benzene than outlined in FDA guidance to confer standing.  Therefore, because each Plaintiff purchased a Neutrogena or Clean & Clear acne BPO product, each has alleged standing to pursue monetary damages.[13]

### 2.    *Injunctive Relief*

As for injunctive relief, to satisfy Article III standing, plaintiffs "must establish that [they are] likely to suffer future injury from [Defendants'] conduct." *Johnson & Johnson*, 903 F.3d at 292 (internal quotations marks and citations omitted).  In *Johnson & Johnson*, the plaintiff purchased Johnson & Johnson's Baby Powder, which she alleged contained talc, and sought two forms of injunctive relief: (1) an order requiring defendants to engage in corrective advertising, and (2) an order enjoining defendants from continuing their unlawful practices of selling Baby

---

[13]    Accordingly, the Court also finds Plaintiffs have standing to pursue their claims for restitution. *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 291-92 (3d Cir. 2018) (finding standing analysis for monetary damages and restitution was based on "the same rationale").

Powder without a warning of the health risks. *Id*. at 292. The Third Circuit concluded the plaintiff did not have standing to pursue injunctive relief because she "makes clear in this very lawsuit that she is well aware of health risks associated with using Baby Powder, [so] we readily conclude that she is not likely to suffer future economic injury." *Id.* As the Third Circuit explained, "[t]he law affords [plaintiff] the dignity of assuming that she acts rationally, and that she will not act in such a way that she will again suffer the same alleged 'injury.'" *Id.* at 293; *see also Howard*, 2024 WL 4272931, at *5 (finding no standing for injunctive relief when plaintiffs failed to allege that they would buy defendants' BPO acne products in the future).

Here, Plaintiffs seek similar injunctive relief as the *Johnson & Johnson* plaintiff, (ECF No. 69 at 104), and it is clear they have no intention of purchasing Defendants' BPO products in the future. (*see, e.g.*, ECF No. 59 ¶ 101 ("If Defendants had disclosed to Plaintiffs and putative Class members that the BPO Products contain and/or degrade to form benzene, Plaintiffs and putative Class members would not have purchased the BPO Products.").) Therefore, Plaintiffs' argument— that a standing analysis for injunctive relief is premature—is unconvincing, and the Court "conclude[s] that [Plainitffs] do[] not have standing to seek injunctive relief." *Johnson & Johnson*, 903 F.3d at 293.[14]

---

[14]    Plaintiffs also seek declaratory relief. (ECF No. 59 at 104.)  But the sole reference to declaratory relief in the Consolidated Class Action Complaint is "made in connection with [Plaintiffs'] request for injunctive relief." *Johnson & Johnson*, 903 F.3d at 292. n.19.  Indeed, the full prayer for relief with respect to declaratory relief states: "An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct." (ECF No. 59 at 104.)  Accordingly, Plaintiffs do not have standing to pursue declaratory relief. *Johnson & Johnson*, 903 F.3d at 292. n.19 ("Because [the plaintiff's] references to 'declaratory' relief appear to be a mere rehashing of her requests for injunctive relief . . . we need not repeat our standing analyses . . . .")*; see also In Re Target Corp. BPO Sales & Mktg. Litig.*, Civ. No. 24-1323, 2026 WL 145824, at *6 (D. Minn. Jan. 20, 2026) (finding the plaintiffs lacked standing to pursue injunctive and declaratory relief).

## B.    Preemption and Failure to State a Claim

The parties contest whether Plaintiffs' state statutory and common law claims are preempted by the FDCA.  (ECF No. 60-1 at 33-37; ECF No. 63 at 15-26; ECF No. 65 at 8-12.) While the Court finds that not all of Plaintiffs' claims are preempted, Plaintiffs have nonetheless failed to state a claim under Rules 8 and 9.

The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, displaces state law that "interferes with or is contrary to federal law." *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 287 (3d Cir. 2020) (quoting *Free v. Bland*, 369 U.S. 663, 666, (1962)).  There are three ways that "[f]ederal law can preempt state law . . . : (1) express preemption; (2) field preemption; or (3) conflict preemption." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021) (citing *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010)).  These categories "'are not rigidly distinct' . . . [a]nd at least one feature unites them: Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (first quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 n.6 (2000); and then quoting *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)).

---

Defendants also argue that Plaintiffs lack standing to bring claims on behalf of putative class members in other states, noting the split within the Third Circuit on this issue. (ECF No. 60-1 at 42 (citing *Snowdy v. Mercedes-Benz USA, LLC*, Civ. No. 23-1681, 2024 WL 1366446, at *5 (D.N.J. Apr. 1, 2024)).)  The Court, however, need not address this argument at this early, pre-class certification stage. *See Rolland v. Spark Energy, LLC*, Civ. No. 17-2680, 2019 WL 1903990, at *5 & n.5 (D.N.J. Apr. 29, 2019).

When federal preemption is invoked, the "inquiry is guided by two principles." *Navient Corp.*, 967 F.3d at 288 (citing *Farina*, 625 F.3d at 115). The first is that "the intent of Congress is the 'ultimate touchstone' of preemption analysis." *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). In discerning congressional intent, courts "look to the language, structure, and purpose of the relevant statutory and regulatory scheme to develop a reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 (3d Cir. 2018) (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016)).

The second principle is "the basic assumption that Congress did not intend to displace state law." *Navient Corp.*, 967 F.3d at 288 (quoting *Farina*, 625 F.3d at 116). "[B]ecause the States are independent sovereigns in [the] federal system, [courts] have long presumed that Congress does not cavalierly preempt state-law causes of action," especially when a "state is exercising its police power." *Id.* (quoting *Lohr*, 518 U.S. at 485). However, when a federal statute contains an express preemption clause or when a case arises in an area that has historically been heavily regulated by the federal government, courts "do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the [the statute], which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)).[15]

The FDCA, which provides no private right of action, *see In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 788 (3d Cir. 1999), contains a broad express preemption

---

[15]    "Preemption is an affirmative defense and therefore, dismissal under Rule 12(b)(6) is only justified when defendant can show that preemption is 'manifest in the complaint itself.'" *Doe-1 v. LexisNexis Risk Sols., Inc.*, Civ. No. 24-4566, 2025 WL 306592, at *6 (D.N.J. Jan. 27, 2025) (quoting *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130-31 (3d Cir. 2018)).

24

provision.   That provision outlines that no state "may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription drug]; and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA.  21 U.S.C. § 379r(a).  "Congress has therefore mandated that states may not create requirements different from the FDCA's requirements."  *Crozier v. Johnson & Johnson Consumer Cos., Inc.*, 901 F. Supp. 2d 494, 503 (D.N.J. 2012).  The statute defines "requirement" to include "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug."  21 U.S.C. § 379r(c)(2).  Courts have interpreted this provision to mean that "virtually any state requirement that relates to the regulation of nonprescription drugs can be preempted, regardless of the common law [or state legislative or regulatory] theory under which it is brought."  *Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008) (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324-25 (2008)); *see also Navarro v. Walmart, Inc.*, Civ. No. 24-00288, 2025 WL 3563471, at *12 (E.D. Cal. Dec. 12, 2025), *report and recommendation adopted*, 2026 WL 266374 (E.D. Cal. Feb. 2, 2026).  But the FDCA "does not preempt claims under state law that impose identical or 'parallel' requirements to FDA regulations, such as where a plaintiff sues over a defendant's violation of the FDCA."  *Eisman v. Johnson & Johnson Consumer, Inc.*, Civ. No. 24-01982, 2025 WL 241024, at *3 (C.D. Cal. Jan. 17, 2025) (citations omitted).  Accordingly, to survive a motion to dismiss, Plaintiffs must bring state causes of action that impose parallel requirements to those imposed by the FDCA and must plausibly allege Defendants violated those requirements.

As relevant to this case, the FDCA and its accompanying regulations impose requirements on Defendants stemming from four sources: 1) the Acne Monograph; 2) the format and content

labeling requirements in 21 C.F.R. § 201.66; 3) the prohibition on adulterating or misbranding drugs in Chapter V of the FDCA; and 4) the cGMPs in 21 C.F.R. §§ 210-211.

Defendants first argue Plaintiffs' claims are preempted because Defendants' practices comply with the Acne Monograph. (ECF No. 60-1 at 33-34.) Defendants also contend that even though Plaintiffs claim Defendants' practices run afoul of Chapter V of the FDCA's general prohibitions on adulteration and misbranding, "Plaintiffs allege no wrongful factual conduct beyond sale of BPO Acne Medications without a benzene warning" so their argument "boils down to the untenable proposition that formulation and labeling of Acne Medication as specifically prescribed by the FDA in the Monograph per se violates general FDCA provisions." (*Id.* at 35.) Last, Defendants argue that "Plaintiffs merely quote [the cGMPs] regulations and detail no alleged violation other than the presence of benzene." (ECF No. 65 at 11.) Defendants do not address the format and content labeling requirements in 21 C.F.R. § 201.66. (*See generally* ECF No. 60-1; ECF No. 65).

Plaintiffs argue their claims are not preempted because the presence of benzene in Defendants' BPO products is a violation of both Chapter V of the FDCA's prohibition on adulterated or misbranded drugs and the cGMPs, and these provisions impose requirements that are additional to the ones imposed by the Acne Monograph. (ECF No. 63 at 17, 21.) Plaintiffs also argue that Defendants' BPO products contain undisclosed benzene in violation of 21 C.F.R. § 201.66, which requires the listing of inactive ingredients on the label. (*Id.* at 24.) The Court will address each of Plaintiff's theories of liability and evaluate whether those theories are preempted, and if they are not, whether Plaintiffs have stated a claim.

### 1.    *Mislabeling or Misbranding*

Plaintiffs allege that Defendants were required to disclose the presence of benzene in their acne products and not doing so constitutes mislabeling or misbranding under 21 C.F.R. § 201.66

and Chapter V of the FDCA.  (ECF No. 59 ¶¶ 100-103, 124-125.)[16]  It is true that the Acne

Monograph contains no such requirement.  *See, e.g., Howard*, 2024 WL 4272931, at *8 ("[T]he

monograph sets forth in detail the exact warnings that must be on the labels of OTC acne drug

products[.]  Those warnings do not include any mention of benzene or its risks.") (citing 21 C.F.R.

§ 333.350(c)(4), (d)(2)).  The more difficult question on which courts disagree is whether the other

sources of FDCA authority establish such a requirement.  If so, then Plaintiffs' theory would

survive if there are parallel state law requirements.

The Court begins with the requirement that OTC drug product labels must list "inactive

ingredients."  21 C.F.R. § 201.66(c)(8).  The regulation defines "inactive ingredient" to be "any

component other than an active ingredient."  21 C.F.R. § 201.66(b)(8).  Whether benzene is an

"inactive ingredient" in Defendants' BPO products thus turns on the definition of "component."

While 21 C.F.R. § 201.66 does not define "component," the term is defined in a different portion

of the same subchapter of the regulation, pertaining to manufacturing: "Component means any

ingredient *intended* for use in the manufacture of a drug product, including those that may not

appear in such drug product."  21 C.F.R. § 210.3(b)(3) (emphasis added).  Every court to have

---

[16]    To the extent the Consolidated Class Action Complaint alleges Defendants were required to disclose *the possibility that BPO degrades into* benzene, Plaintiffs appear to have abandoned this argument and instead stand on the benzene-in-the-products theory.  (*See* ECF No. 63 at 17-18 ("Plaintiffs allege that the sale of BPO Products containing benzene violated state law because the BPO Products should not have been sold with benzene in them."); *id.* at 18 ("Because the BPO Products were contaminated with benzene, they were unfit for human use and violated state law by selling an adulterated acne product containing benzene.").)  In any event, the Court would find such a theory preempted because such a disclosure is not required by the Acne Monograph nor do Plaintiffs cite any other FDCA authority including such a requirement.  Indeed, the Court has reservations that such a theory would even be enough to establish Article III standing.  *See Target Corp.*, 2026 WL 145824, at *5 ("I don't understand [p]laintiffs to allege a mere possibility of degradation . . . .  In this understanding of [p]laintiffs' liability theory, their Article III standing would seem doubtful—if benzene contamination represented merely a risk, then we would have nothing to show that the items [p]laintiffs purchased manifested benzene contamination.").

27

addressed whether it is appropriate to apply this definition—the only definition of "component" in the subchapter—to the labelling context has found it appropriate to do so. *See Howard*, 2024 WL 4272931, at \*8; *Navarro*, 2025 WL 3563471, at \*13; *Bodunde v. Walgreens Boots Alliance, Inc.*, Civ. No. 24-00985, 2025 WL 1411306, at \*13 (E.D. Cal. May 15, 2025); *Kouyate v. Harv. Drug Grp. LLC*, Civ. No. 24-6223, 2025 WL 2773159, at \*10 (S.D.N.Y. Sept. 26, 2025); *Williams v. Galderma Laby's, L.P.*, Civ. No. 24-2222, 2024 WL 4213220, at \*4 (N.D. Ill. Sept. 17, 2024). The Court agrees. Because the definition requires inactive ingredients to be "intended" for use, and because Plaintiffs do not allege Defendants intended to use benzene in their products, Defendants were not required to list benzene on its labels under 21 C.F.R. § 201.66.

But the Court must also resolve whether Defendants were required to label benzene on their products under Chapter V of the FDCA. A drug is misbranded "[i]f its labeling is false or misleading in any particular." 21 U.S.C § 352(a)(1). The labeling is "misleading" if it "fails to reveal facts . . . material with respect to consequences which may result from the use of the article to which the labeling or advertising relates . . . under such conditions of use as are customary or usual." 21 U.S.C § 321(n). Courts have come out differently on the issue of whether a plaintiff's misbranding theories are preempted given these provisions. In *Howard*, the court found the claim was preempted, tying its analysis back to the Acne Monograph: "[d]efendants are not alleged to have made affirmative misrepresentations outside the scope of the monograph. Instead, [p]laintiffs allege that the Proactiv labels are misleading because they omit a warning that the monograph does not require." 2024 WL 4272931, at \*8-9. By contrast, analyzing the same provisions and the same theories, the *Target Corporation* court found the theory was not preempted: "[p]laintiffs' state-law misbranding theory tracks these requirements. They plausibly allege that benzene is present in Up&Up acne treatment products and that benzene causes adverse health consequences. Accepting

28

those allegations as true, the FDCA plausibly would have required Target to disclose benzene's presence in the Up&Up acne treatment products' labeling." 2026 WL 145824, at *10.[17]

The Court finds the approach in *Target Corporation* more convincing. The *Howard* court's analysis relies exclusively on the Acne Monograph, but the FDCA's regulations specifically require adherence to the applicable monograph "*and . . .* each of the conditions contained in this part," including Chapter V of the FDCA, in order to be recognized as safe, effective, and not misbranded. 21 C.F.R. § 330.1 (emphasis added) (outlining separate requirements from the applicable monograph). Indeed, the Acne Monograph itself also recognizes that its labeling requirements are subject to Chapter V of the FDCA. 21 C.F.R. §§ 333.301(a), 333.350(b). Defendants' only response is that the *Target Corporation* approach—under which an entity can comply with the Acne Monograph but still violate the FDCA's more general requirements—is a "reading of federal law [that] defies plausibility," and Defendants cite a string of cases in support of this proposition. (ECF No. 60-1 at 35-36). But Defendants cite the very same cases that the *Target Corporation* court analyzed and found unpersuasive because they "stop[ped] with the [M]onograph." 2026 WL 145824, at *11 (collecting cases). The Court is similarly unpersuaded. And like in *Target Corporation*, Plaintiffs allege that benzene is present in the Neutrogena and Clean & Clear products and causes adverse health consequences. (ECF No. 59 ¶¶ 1, 3, 43, 46, 48, 111, 115, 123, 189, 214, 227.) Therefore, Plaintiffs' claim—that Defendants were required to disclose benzene's presence on the product label even if the Acne Monograph contained no such requirement—is not preempted.

---

[17] It appears that none of the other BPO acne treatment cases considering the preemptive effects of the Acne Monograph have considered the FDCA's definition of "misleading," 21 U.S.C § 321(n), in the misbranding context.

Although Plaintiffs' Chapter V misbranding theory is not preempted, Plaintiffs must still allege that their claims are cognizable under parallel state law. *See Daugherty v. Padagis US LLC*, 794 F. Supp. 3d 674, 694 (N.D. Cal. 2025) ("Plaintiffs provide a laundry list of state statutes without demonstrating that these state regulations actually impose requirements identical to federal ones."). In other words, the state causes of action must themselves be parallel to 21 U.S.C § 352. *See Millman v. Medtronic*, Civ. No. 14-1465, 2015 WL 778779, at *4 n.2 (D.N.J. Feb. 24, 2015) ("To state a 'parallel' claim, a plaintiff must allege (1) the violation of a specific federal requirement applicable . . . ; (2) the violation of an identical state-law duty; and (3) that the predicate federal violation caused his or her injuries.").

Here, Plaintiffs' conclusory allegation that "[states] have enacted laws adopting or mirroring th[is] federal standard[]" is insufficient to adequately plead that the state causes of action that Plaintiffs bring in this case are parallel to 21 U.S.C § 352. (ECF No. 59 ¶ 81.) In a footnote, Plaintiffs cite a handful of statutes—from California, Louisiana, Missouri, and New York City—that largely track 21 U.S.C § 352. (*See id.* ¶ 96 n.64 (Cal. Health & Safety Code § 111330 ("Any drug or device is misbranded if its labeling is false or misleading in any particular.")); *id.* (La. Rev. Stat. § 40:617 ("A drug or device is considered misbranded if it has been found to be such by any department of the United States government, or . . . [i]f its labeling is false or misleading in any particular.")); *id.* (Mo. Rev. Stat. § 196.100(1) ("Any manufacturer, packer, distributor or seller of drugs or devices in this state shall comply with the current federal labeling requirements contained in the [FDCA], as amended, and any federal regulations promulgated thereunder. Any drug or device which contains labeling that is not in compliance with the provisions of this section shall be deemed misbranded.")); *id.* (N.Y.C. Health Code § 71.05(f) ("A drug shall be deemed misbranded as set forth in the Federal [FDCA] (21 U.S.C. § 352)[.]")).) However, Plaintiffs do not "make the[]

direct connections" clear between these statutory provisions and the ones Plaintiffs allege Defendants violated in their Consolidated Class Action Complaint. *Navarro*, 2025 WL 3563471, at *14. (*Compare* ECF No. 59 ¶ 96 & n.64, *with id.* ¶¶ 160-161, 180-181, 191-200). For example, it is unclear what relevance a statute from Louisiana has on the instant matter when no Plaintiff resides in or purchased BPO products in Louisiana. (*See id.* ¶¶ 8-20.) And while at least two Plaintiffs reside in Missouri, the statutory provision Plaintiffs allege Defendants violated is the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407, *et seq.*, (*id.* ¶¶ 29-30, 194), but Plaintiffs do not explain the connection, if any, between this provision and the one setting forth drug labeling requirements that are parallel to the FDCA. The same is true for California and New York City. (*See id.* ¶¶ 149, 158, 161, 180-181, 191, 196).

And, apart from the parallelism deficiencies with respect to state statutory causes of action, nowhere do Plaintiffs allege or otherwise explain parallelism with respect to the common law theories of relief. *See Conley v. St. Jude Med., LLC*, 482 F. Supp. 3d 268, 275 (M.D. Pa. 2020) ("In order to adequately allege a 'parallel' claim that would escape preemption, a plaintiff must generally allege 'specific violations of federal law that establish a parallel state duty' [but] '[g]eneralized common law theories of liability' do not suffice to meet this standard.") (citing *Williams v. Cyberonics, Inc.*, 388 F. App'x 169, 171 (3d Cir. 2010)); *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (noting the practical issues regarding "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes").[18] Because

---

[18] Indeed, courts that have found preemption or an inadequate pleading of parallelism with respect to state statutes have not evaluated plaintiffs' state common law theories. *See Daugherty v. Padagis US LLC*, 794 F. Supp. 3d 674, 683, 693-96 (N.D. Cal. 2025) (not specifically evaluating breach of the implied warranty of merchantability and unjust enrichment claims); *Navarro v. Walmart, Inc.*, Civ. No. 24-00288, 2025 WL 3563471, at *12 (E.D. Cal. Dec. 12, 2025) (same), *report and recommendation adopted*, 2026 WL 266374 (E.D. Cal. Feb. 2, 2026).

"Plaintiffs have failed adequately to allege with specificity parallelism of each state law asserted" with respect to the misbranding theory under 21 U.S.C § 352, *Daugherty*, 794 F. Supp. 3d at 694, the claim cannot go forward.

### 2.    *Adulteration*

Plaintiffs argue that because Defendants sold products with benzene, those products were "adulterated" in violation of the FDCA and therefore any corresponding state claims are not preempted.   (ECF No. 59 ¶¶ 72-81, 90-91; ECF No. 63 at 21.)  Plaintiffs allege that Defendants' products were adulterated under 21 U.S.C. § 351(a)(2)(B).  (ECF No. 59 ¶¶ 90. 120).  Section 351(a)(2)(B) provides that drug products are adulterated if they do not comply with the cGMPs in 21 C.F.R. §§ 210-211.  *See* 21 U.S.C. § 351(a)(2)(B).  Thus, Plaintiffs allege Defendants did not comply with the cGMPs because the products contain benzene, and because Defendants did not comply, the products are adulterated.  (ECF No. ¶¶ 72, 81, 90-91).

Courts generally find cGMP-based claims are not preempted in the acne BPO products context.  *See, e.g.*, *Navarro*, 2025 WL 3563471, at *14 ("The Court concludes that to the extent [p]laintiffs' state law claims are parallel claims brought for violations of cGMPs, those claims are not categorically preempted."); *Daugherty*, 794 F. Supp. 3d at 694 (similar); *Target Corp.* 2026 WL 145824, at *11 (proceeding to analyze merits of cGMP claims);  *Williams*, 2024 WL 4213220, at *5 (finding "claim is preempted to the extent she argues [defendant] should have mentioned benzene on [product's] label—either as a warning or as an inactive ingredient—but is not preempted based on [defendant's] alleged failure to comply with cGMPs").  The Court sees no reason to depart from these cases and therefore finds the cGMP claims based on the adulteration theory are not preempted to the extent they are parallel to state cGMP provisions.

While courts that have addressed cGMP arguments find those claims are not preempted, they have come out differently on whether plaintiffs sufficiently state a claim.  In *Navarro*, the

32

court advised plaintiff "to make the[] direct connections" clear between the cGMPs and state law claims "as opposed to requiring [the defendant] and the [c]ourt to put the pieces together in a complex pleading." *Navarro*, 2025 WL 3563471, at \*14. But even if parallelism were satisfied, the court found plaintiffs failed to state a claim under Rule 8—not to mention Rule 9(b)—because "the allegations identified by [p]laintiffs seemingly require assuming that because benzene was later discovered in third-party testing of Walmart's BPO products, that this necessarily, in and of itself, leads to the plausible conclusion that Walmart failed to abide by the cGMPs . . . ." *Id.* at \*17. The court found the allegations conclusory and the logic both "missing [a] step," and "circular." *Id.* at \*17-18. In *Daugherty*, the court dismissed the cGMP claims because plaintiffs failed to plead (1) the parallel state laws incorporating the cGMPs with specificity and (2) "specific facts establishing [d]efendants' violations of particular cGMPs and how such violations renders the BPO [p]roducts adulterated." 794 F. Supp. 3d at 694-96. The *Target Corporation* court also found the cGMP allegations conclusory. 2026 WL 145824, at \*11. However, that court separately found the adulteration theory survived "because the at-issue products plausibly contained benzene," but the court tied this finding to 21 U.S.C. § 351(a)(1)—which states a product is adulterated "if it consists in whole or part of any filthy, putrid, or decomposed substance"—instead of the cGMPs. *See id.* at \*3, \*11.[19]

---

[19]    *Target Corporation* did not elaborate on why 21 U.S.C. § 351(a)(1) provided a sufficient basis for the plaintiffs' benzene adulteration claim. 2026 WL 145824, at \*11. Here, apart from a conclusory recitation of the statute, Plaintiffs do not address whether, because Defendants' products contain benzene, those products "consist[] in whole or part of any filthy, putrid, or decomposed substance." (ECF No. 63 at 21 (citing 21 U.S.C. § 351(a)(1).) To the extent they allude to such an argument, it is in direct connection to the cGMP theory. (*Id.* at 11-12 ("Defendant failed to comply with the FDA current [cGMPs] by allowing the BPO in its Products to decompose and form benzene.").) Unlike *Target Corporation*, the Court therefore only considers the adulteration claim in the context of the cGMP theory and not in the isolated context of 21 U.S.C. § 351(a)(1).

33

By contrast, in *Williams*, the court found the plaintiff's allegations that defendant "could not have complied with cGMP testing and safety requirements because had they done so, [defendant] would have detected benzene" to be sufficient.  2024 WL 4213220, at *6.  The Court recognized the "ipso facto reasoning" baked into these allegations, but instead of dismissing them for this reason—like in *Navarro*, 2025 WL 3563471, at *17-18—the court found "the facts alleged plausibly suggest [plaintiff] is entitled to relief."  *Williams*, 2024 WL 4213220, at *6.  Accordingly, the parallel state law claims survived.  *Id.*

The Court finds that, even if not preempted, Plaintiffs cGMP claims fail for two reasons.  First, plaintiffs do not adequately allege parallelism.  *See Daugherty*, 794 F. Supp. 3d at 694; *Navarro*, 2025 WL 3563471, at *18.  While Plaintiffs do allege many state statutes are parallel to the cGMPs,[20]  Plaintiffs do not "make the[] direct connections," *Navarro*, 2025 WL 3563471, at *14, between those statutes and the ones under which Plaintiffs seek relief.  (*Compare* ECF No. 59 ¶ 79, with *id.* ¶¶ 160-161, 180-181, 191-200.)  For example, while it appears California has incorporated the federal cGMP regulations, *see* Cal. Health & Safety Code §§ 110105, 111260, Plaintiffs do not cite the incorporating provisions in their Consolidated Class Action Complaint, or even in their briefing, (*see generally* ECF No. 59; ECF No. 63).  *See Daugherty*, 794 F. Supp. 3d at 691 & n.4, 694-95 (noting plaintiffs cited relevant California provision in their complaint and allowing California cGMP claims to proceed as non-preempted but nonetheless finding those claims inadequate under Rules 8 and 9).  And the Court notes that, like in *Daugherty*, "certain [statutes in the pleading] appear to merely bar the sale of 'adulterated' drugs [but] do not incorporate" the cGMPs.  *Id.* at 694 ("Plaintiffs provide a laundry list of state statutes without

---

[20]   Plaintiffs do not explain how the state *common law* claims are parallel to the cGMPs.  *See Conley v. St. Jude Med., LLC*, 482 F. Supp. 3d 268, 275 (M.D. Pa. 2020).

34

demonstrating that these state regulations actually impose requirements identical to federal ones[.] Plaintiffs have failed adequately to allege with specificity parallelism of each state law."). Therefore, Plaintiffs' adulterated theory claims cannot move forward at this time.

Second, even if the connections were clear, the Court—like the majority of those before it—finds the allegations too conclusory to state a claim. Like in *Navarro*, Plaintiffs recite a long list of cGMPs Defendants have allegedly violated. (ECF No. 59 ¶ 88.) For the vast majority of these, Plaintiffs provide no further elaboration. These recitations are therefore just legal conclusions, and "legal conclusions do not plausibly show liability." *Target Corp.*, 2026 WL 145824, at *11 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Conley*, 482 F. Supp. 3d at 277 ("[I]nsofar as Plaintiffs attempt to use the [c]GMPs as the basis for a parallel claim, courts have regularly found that general citations to the [c]GMPs or federal regulations are not specific enough to sustain a parallel claim.") (collecting cases).

The only allegations that go beyond reciting the cGMPs verbatim are those that pertain to testing requirements. (ECF No. 59 ¶¶ 120-127.) Plaintiffs allege Defendants:

> did not adequately test the BPO Products before selling them to consumers. Defendants' Products are "drugs" regulated by the FDA. As with any regulated drug, Defendants . . . must have test procedures and processes to ensure the drug's components (active and inactive ingredients), and finished products are safe. Both raw ingredient materials and finished batches must be tested before released to the public to confirm they meet specifications for identity, strength, quality, and purity. If testing results of the raw materials or finished product do not conform with the specifications, the product cannot be sold to the public. Defendants must also re-test any Products subject to deterioration.

> Defendants must also do stability testing to understand the "shelf life" of the Products and to assign an expiration date. It is well known in the scientific community (but not among consumers) that certain chemical ingredients can degrade or change because of environmental, and storage conditions such as light, moisture, temperature, and humidity, or because of the passage of time. The

> stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods." If stability testing finds a drug product is not stable under expected storage or use conditions, degrades, or create toxic byproducts, the product cannot be sold to the public.
>
> Had Defendants adequately tested its BPO Products for benzene, it would have discovered that its Products contained benzene at levels above even the FDA's "safe harbor" exception limit of 2 ppm, making the Products illegal to distribute, market, and sell, thus warranting a recall.

(*Id.* ¶¶ 120-121, 126 (citing 21 C.F.R. §§ 211.84, 160, 166).)

These allegations do little more than summarize the cGMPs and miss a key logical step. They assume that because the products contained benzene, as demonstrated in the Valisure study, then Defendants failed to comply with the cGMP standards. But Plaintiffs nowhere plead what testing mechanisms Defendants undertook; they simply point to the third-party testing results. As several courts have found, this is insufficient. *Navarro*, 2025 WL 3563471, at *17-18 (discussing caselaw in which "'[r]es ipsa loquitor' was not enough to survive the relevant FDA preemption" under Rule 8, holding accordingly, and noting that the cGMP theory also failed under Rule 9 because "plaintiffs do not assert *how* Walmart violated or deviated from specific cGMP standards and *how* such deviations led to the adulteration of its BPO products") (emphasis in original); *Target Corp.*, 2026 WL 145824, at *11 (finding theory "that benzene's presence in Target's Up&Up BPO acne treatment products resulted from Target's violations of cGMPs" conclusory). Accordingly, the Court dismisses Plaintiffs claims brought under the adulteration theory.

36

## IV.     CONCLUSION

For the foregoing reasons, and other good cause shown, Defendants' Motion to Dismiss (ECF No. 60) is **GRANTED**.  An appropriate Order follows.


Dated: February 24th, 2026

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**