**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALAN MONTENEGRO, MELISSA MEDINA, NOAH LONG, DANIEL FELDTKELLER, ROBIN COREY, MARILYN SAAVEDRA, LESLIE LAMAY, ALEXANDRA DONATO, JENNY QU, KAYLEIGH SCHNEIDER, STARNELLA HARDER, JOHNE CONTE, BRENDA MORGAN, JOSEPH LONG, ABDALLAH AL-QUDSI, CHERYL POWERS, VERUNIKA DUJMOVIC, and DANIEL CALZADO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>JOHNSON AND JOHNSON CONSUMER, INC., KENVUE, INC., and DOES 1 to 50, Inclusive,<br><br>Defendants. | Case No. 3:24-cv-09226-GC-JBD |
| ETHEL MITCHELL, ANNETTE HAGGERTY, and PAULETTE WILLIAMS,<br><br>Plaintiffs,<br><br>v.<br><br>KENVUE, INC., and JOHNSON & JOHNSON CONSUMER INC.,<br><br>Defendants. | Case No. 3:24-cv-04109-GC-JBD |

| | |
|---|---|
| ASHLY JONES and BASIM JOHNSON,<br><br>Plaintiffs,<br><br>v.<br><br>KENVUE, INC., and JOHNSON & JOHNSON CONSUMER INC.,<br><br>Defendants. | Case No. 3:24-cv-08571-GC-JBD |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, Alan Montenegro, Melissa Medina, Noah Long, Daniel Feldtkeller, Robin Corey, Marilyn Saavedra, Leslie Lamay, Alexandra Donato, Jenny Qu, Kayleigh Schneider, Starnella Harder, Johne Conte, Brenda Morgan, Joseph Long, Abdallah Al-Qudsi, Cheryl Powers, Verunika Dujmovic, Daniel Calzado, Ethel Mitchell, Annette Haggerty, Paulette Williams, Ashly Jones, and Basim Johnson (collectively "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their attorneys, bring this class action complaint against Defendants, Johnson & Johnson Consumer, Inc. and Kenvue, Inc. ("Defendants"). Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable

opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action lawsuit regarding Defendants' manufacturing, distribution, advertising, marketing, and sale of Clean and Clear and Neutrogena branded benzoyl peroxide acne treatment products ("BPO Products"). Plaintiffs seek to redress the economic injuries caused by Defendants arising from its manufacturing, distribution, marketing, and sale of BPO Products that contain and/or degrade into dangerously high levels of benzene—a known human carcinogen, impurity, and illegal adulterant.

2. The BPO Products are topical drugs used to treat acne vulgaris ("acne"), formulated with the active ingredient benzoyl peroxide ("BPO"). BPO is chemically unstable, and scientific literature and independent testing show that without adequate formulation, testing, and controls, it degrades into benzene under normal consumer use, handling, and storage conditions.

3. Benzene is a well-known human carcinogen linked to leukemia and other cancers. Indeed, for over a century, the scientific and regulatory communities have recognized benzene as a potent human carcinogen with no safe level of human exposure. Accordingly, benzene is not permitted in pharmaceutical products except in trace amounts when absolutely unavoidable. By incorporation

of the United States Pharmacopeia ("USP") standards, the FDCA establishes a strict 2 parts per million (ppm) maximum limit for benzene in covered products.[1]

4. Over-the-counter acne medications containing BPO are regulated under the FDA's Acne Drug Products Monograph ("Acne Monograph"), codified at 21 C.F.R. § 333.301. *et seq*., and are required to comply with the general conditions set forth in 21 C.F.R. § 330.1. Those conditions mandate compliance with the adulteration and misbranding provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"),[2] adherence to current Good Manufacturing Practices ("cGMPs"),[3] and conformity with applicable USP standards.[4]

5. The BPO Products at issue include, without limitation, to (1) Clean & Clear Persa-Gel® 10, (2) Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, (3) Neutrogena Rapid Clear Stubborn Acne Spot Gel, (4) Neutrogena On the Spot Acne Treatment, (5) Neutrogena Stubborn Acne AM Treatment, and (6) Stubborn Marks PM Treatment, and are sold in various forms including creams, washes, gels, scrubs, and bars. The various forms (i.e. washes vs gels) of BPO Products manufactured by Defendants are not meaningfully different

[1] 21 U.S.C. § 321(j); 21 U.S.C. § 351(b); U.S. Pharmacopeia, *General Chapter <467> Residual Solvents* at 3–4, tbl. 1, USP-NF Online (last visited Jan. 4, 2026).

[2] 21 C.F.R. § 330.1(c)(1); 21 U.S.C. §§ 351, 352.

[3] 21 C.F.R. § 330.1(a); 21 U.S.C. § 351(a)(2)(B).

[4] 21 C.F.R. § 330.1(c); 21 U.S.C. § 351(b)

for purposes of benzene formation, adulteration, or regulatory compliance. Each BPO Product contains benzoyl peroxide as the active ingredient, is subject to the same chemical degradation pathways, is regulated under the same FDA Acne Monograph, and is required to comply with the same cGMPs.

6. The benzene contamination and degradation alleged herein arise from Defendants failing to establish scientifically sound purity specifications and benzene limits, failing to adequately test raw materials and finished products, failing to conduct meaningful stability testing that accounted for known benzene degradation pathways, failing to maintain proper temperature-controlled manufacturing, storage, and distribution conditions, assigning expiration dates unsupported by stability data, and releasing and selling contaminated batches that should have been rejected in violation of parallel federal and state law. Defendants' failure to comply with these requirements, rendered the BPO Products adulterated and illegal to sell as Over-the-Counter ("OTC") drugs.

7. Given the well-known instability of benzoyl peroxide and the FDA's alerts, guidance, and enforcement actions requiring drug manufacturers to test for benzene and ensure that BPO Products remain stable and do not degrade into toxic byproducts, Defendants knew or should have known that the BPO Products contain benzene and/or degrade into benzene during normal use, handling, and storage.

8. Despite this knowledge, Defendants placed the BPO Products into the stream of commerce ending in the hands of consumers, who in turn put the misbranded and adulterated BPO Products directly on their skin as instructed. Thus, Defendants misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by selling an adulterated drug—due to (1) the presence of benzene, (2) failure to comply with cGMPs, and (3) purport to sell a product which has an identity that is governed by an official compendium and failed to meet those requirements—and by not including a disclosure of the presence of benzene or the ability of BPO to degrade into benzene on the BPO Products' labels or otherwise warning consumers about its presence.

9. Plaintiffs and Class members reasonably relied on Defendants' representations that the BPO Products were an acne "treatment" that was safe to use as instructed, unadulterated, and free from dangerous levels of human carcinogens.

10. Plaintiffs and Class members purchased the BPO Products, which have been found to contain harmful levels of benzene.

11. The BPO Products are in fact worthless, because they contain benzene at levels that render the BPO Products adulterated, misbranded, and illegal to sell under various state laws.

12. Defendants are therefore liable to Plaintiffs and Class members for manufacturing, producing, and selling BPO Products that contain elevated and dangerous levels of benzene, which render the Products adulterated and misbranded under state law.

## PARTIES

### I. PLAINTIFFS

13. Plaintiff Alan Montenegro is a California resident, located in Los Angeles County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from 2017 to 2021. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use.

Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

14. Plaintiff Melissa Medina is a Nevada resident, located in Carson County who bought BPO Products including Clean & Clear Continuous Control Acne Cleanser from September 2020 to May 2023. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein.

When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

15. Plaintiff Brenda Morgan is a California resident, located in Merced County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel, Clean & Clear Persa-Gel® 10, and Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash from 1980 to 2020. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of

benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff Morgan had her personal, unused portion of Neutrogena On-the-Spot Treatment, Neutrogena Rapid Clear Stubborn Acne Spot Gel, and Neutrogena Stubborn Acne AM Treatment independently tested by a qualified analytical laboratory. The analysis revealed that the product contained staggering levels of benzene—respectively, 242.86 ppm, 696.83 ppm, and 218.31 ppm. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the

price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

16. Plaintiff Cheryl Powers is a California resident, located in San Diego County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from 2012 to 2022. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene

or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

17. Plaintiff Jenny Qu is a California resident, located in San Francisco County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from July 2023 to October 2023. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the

BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

18. Plaintiff Daniel Feldtkeller is a California resident, located in Santa Barbara County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from December 2006 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the

accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

19. Plaintiff Leslie LaMay is a California resident, located in San Diego County who bought BPO Products including Neutrogena Stubborn Acne AM Treatment from April 2021 to April 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold

under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

20. Plaintiff Kayleigh Schneider is a Connecticut resident, located in Middlesex County who bought BPO Products including Johnson & Johnson's Persa-Gel® 10 from 2021 to April 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed,

testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

21. Plaintiff Verunika Dujmovic is an Illinois resident, located in Cook County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel, Neutrogena Stubborn Acne AM Treatment and Neutrogena

Stubborn Marks PM Treatment from 2015 to April 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the

price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

22. Plaintiff Abdallah Al-Qudsi is an Illinois resident, located in DuPage County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from April 2009 to April 2023. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene

or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

23. Plaintiff Marilyn Saavedra is a Maryland resident, located in Baltimore County who bought BPO Products including Clean & Clear Persa-Gel® 10, Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, and Neutrogena Rapid Clear Stubborn Acne Spot Gel from September 2018 to April 2022. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly

manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

24. Plaintiff Johne Conte is a New York resident, located in Warren County who bought BPO Products including Neutrogena On-the-Spot Acne Treatment from August 2018 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing

the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

25. Plaintiff Starnella Harder is an Ohio resident, located in Lorain County who bought BPO Products including Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash from September 2021 to 2023. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects

all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

26. Plaintiff Alexandra Donato is a Pennsylvania resident, located in Delaware County who bought BPO Products including Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, Neutrogena Rapid Clear Stubborn Acne Spot Gel, and Neutrogena Stubborn Acne AM Treatment from 2021 to 2023. Because BPO naturally degrades into benzene under normal storage and transport

conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

27. Plaintiff Joseph Long is a Washington resident, located in Clark County who bought BPO Products including Johnson & Johnson's Persa-Gel® 10 from March 2023 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale

within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

28. Plaintiff Noah Long is a Washington resident, located in Clark County who bought BPO Products including Johnson & Johnson's Persa-Gel® 10 from March 2023 to March 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO

Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

29. Plaintiff Robin Corey is a Washington resident, located in Clallam County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from July 2018 to February 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the

BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

30. Plaintiff Daniel Calzado is a New York resident, located in Monroe County who bought BPO Products including Neutrogena Rapid Clear Stubborn Acne Spot Gel from May 2022 to May 2024. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. Plaintiff Calzado had his personal, unused portion of Neutrogena On-the-Spot Acne Treatment independently tested by a qualified analytical laboratory. The analysis revealed that the product contained a staggering 238.29 ppm of benzene. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold

under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

31. Plaintiff Ethel Mitchell, an adult resident of Prince George's County, Maryland, purchased and used the BPO Products in Maryland for many years, including within the last year. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line

confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

32. Plaintiff Annette Haggerty, an adult resident of Gregg County, Texas, purchased and used the BPO Products in Texas for many years, including within the last year. She purchased and used the Products which are marketed, packaged, and labeled as containing 10 percent BPO. Because BPO naturally degrades into

benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

33. Plaintiff Paulette Williams is an adult resident of Columbus, Ohio, where she purchased and used the BPO Products within the last year, including the Products which are marketed, packaged, and labeled as containing 10 percent BPO. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was

not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

34. Plaintiff Ashly Jones, an adult resident of St. Louis County, Missouri, resided in Kansas City, Missouri, when she purchased and used the BPO Products in Missouri for many years. She moved from Kansas City to St. Louis in 2022. Plaintiff Jones purchased the BPO Products in Kansas City, Missouri during the time alleged. Specifically, she purchased and used "Neutrogena Rapid Clear Stubborn Acne Spot Gel," "Neutrogena On-the-Spot Acne Treatment," and "Neutrogena Clear Pore Cleanser/Mask." Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product

was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

35. Plaintiff Basim Johnson, an adult resident of St. Louis County, Missouri, resided in Kansas City, Missouri, when he purchased and used the BPO Products in Missouri for many years. He moved from Kansas City to St. Louis in 2022. He purchased and used the Products that are marketed, packaged, and labeled as containing 10 percent BPO. Plaintiff Johnson purchased the BPO Products in Kansas City, Missouri during the time alleged. Specifically, he purchased and used "Neutrogena Rapid Clear Stubborn Acne Spot Gel," "Neutrogena On-the-Spot Acne Treatment," and "Neutrogena Clear Pore Cleanser/Mask." He would have purchased and used less expensive, alternative acne treatments which are not contaminated by benzene and are superior to the

BPO Products for that reason. Because BPO naturally degrades into benzene under normal storage and transport conditions (although, accelerated by exposure to heat and humidity), all of Plaintiff's purchased BPO Products contained benzene, which was not disclosed to Plaintiff prior to purchase. Indeed, testing of this product line confirms the presence of benzene, which is a product of a naturally occurring chemical reaction that affects all BPO Products. As such, Plaintiff's products were adulterated and misbranded, and thus, were illegally sold under parallel state and federal laws. Plaintiff has suffered economic damages as a result of Defendants' violations of the state laws alleged herein. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendants that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, Defendants' BPO Products had Defendants warned about the presence of benzene or that the BPO Products could degrade into benzene, was unfit for human use, i.e., worthless, was not what the BPO Product purported to be, was illegal for sale within the United States, and/or contained less value than the price paid. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

36. Standing is satisfied by alleging economic injury. Here, Plaintiffs suffered economic injury when they spent money to purchase BPO Products they would not otherwise have purchased, or paid less for, absent Defendants' misconduct, as alleged herein. Members of the putative class have likewise suffered economic injuries in that they have spent money to purchase BPO Products they would not otherwise have purchased, or paid less for, absent Defendants' misconduct, as alleged herein.

37. Plaintiffs and putative Class members have suffered a concrete and particularized injury, because they have been denied the opportunity to make informed financial and healthcare decisions due to the Defendants' misconduct. The decision to purchase or not purchase BPO Products that contain or degrade to form benzene at any level is a financial and healthcare decision that affects Plaintiffs and members of the putative class in a very personal and individual way. By failing to disclose the presence of benzene in its BPO Products' labeling, Plaintiffs and individual members of the putative Class were denied the opportunity to make informed decisions, and instead unwittingly purchased and used BPO Products they would have not have otherwise purchased, or paid less for, absent Defendants' misconduct. Plaintiffs' and the putative Class members' injuries are therefore traceable to Defendants' acts or omissions. Plaintiffs and the putative Class members also seek monetary damages to address the monetary harm

caused by Defendants' actions, so there is a substantial likelihood that the relief sought will redress the injuries. As a result, Plaintiffs and members of the putative Class have Article III standing.

## II. DEFENDANTS

38. Defendants Johnson & Johnson Consumer Inc. is a citizen of Delaware with its principal place of business located in New Jersey. Johnson & Johnson Consumer Inc. is a subsidiary of Johnson & Johnson (JNJ). Defendants sells BPO Products under the brand names Clean and Clear and Neutrogena. Defendants' BPO Products include, *inter alia:* (1) Clean & Clear Persa-Gel® 10, (2) Clean & Clear Continuous Control Benzoyl Peroxide Acne Face Wash, (3) Neutrogena Rapid Clear Stubborn Acne Spot Gel, (4) Neutrogena On the Spot Acne Treatment, (5) Neutrogena Stubborn Acne AM Treatment, and (6) Stubborn Marks PM Treatment. At all relevant times, Defendants conducted business and derived substantial revenue from its manufacturing, advertising, marketing, distributing, and selling of the BPO Products throughout the United States.

39. Defendants Kenvue, Inc. is a Delaware corporation with its principal place of business located in New Jersey. Kenvue, Inc. is a subsidiary of JNJ, who (since being spun out in about 2023) shares responsibility for consumer health products including brands Clean and Clear and Neutrogena.[5] At all relevant times,

[5] Kenvue, Inc., *Iconic Brands Rooted in Science*, https://www.kenvue.com/brands?q=clean

Defendants conducted business and derived substantial revenue from its manufacturing, advertising, marketing, distributing, and selling of the BPO Products throughout the United States.

40. Defendants are collectively referred to hereinafter as "JNJ" or "Defendants." Defendants and their agents promoted, marketed, and sold the BPO Products throughout the United States. The unfair, unlawful, deceptive, and misleading advertising and labeling of the BPO Products were prepared and/or approved by Defendants and their agents and were disseminated by Defendants and their agents through statements, labeling and advertising containing the misrepresentations alleged and disseminated uniformly through advertising, packaging, containers, and via websites and social media.

**JURISDICTION AND VENUE**

41. This Court has jurisdiction over this matter by virtue of 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are numerous Class members and members of the Class are citizens of states different than Defendants. This Court has supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367.

(last visited May 24, 2024).

42. This Court has personal jurisdiction over Defendants because this action arises out of and relates to Defendants' contacts with this forum. Specifically, Defendants knowingly placed the Products into the stream of commerce directed into this District. Defendants have advertised and marketed within this District through the wires and mail and via e-commerce websites through which residents of this state and District can purchase the Products. Further, Defendants knowingly directs electronic activity into this state and District with the intent to engage in business interactions and has in fact engaged in such interactions. Moreover, Defendants makes the Products available at retailers throughout this District.

43. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendants' respective headquarters are located in New Jersey, Defendants have intentionally availed themselves of the laws and markets of this district, and Defendants are subject to personal jurisdiction in this district.

44. Throughout this Complaint, references to federal law, including the FDCA and FDA regulations, are made solely for context and background purposes. All claims alleged herein arise under state law and do not seek to enforce the FDCA or any federal regulation. The state-law claims are parallel to federal requirements and do not impose obligations that exceed or conflict with federal law.

45. Plaintiffs are not attempting to bring a private cause of action to enforce the FDCA. Instead, Plaintiffs' claims are independent state-law claims for unfair competition, false advertising, consumer protection violations, warranty breaches, negligent misrepresentation, and unjust enrichment. Nothing in this Complaint requires the Court to interpret or enforce any federal requirement beyond providing context for the state-law claims.

## GENERAL ALLEGATIONS

### III. Defendants' History in the Industry

46. Fifty million Americans suffer from acne annually, making it a billion-dollar industry and a key business segment for Defendants, who are among America's most prominent companies.[6] Acne is the most common skin condition in the United States with a prevalence among adolescents of almost 95 percent.[7] Acne can begin as early as age seven and, for some, can persist through adulthood and into ages 50s and 60s.[8]

47. Consumers are trusting of Defendants and their BPO Products, because JNJ is a household name familiar to every American. JNJ started over 135 years ago and employs over 150,000 employees around the globe. In 2022, JNJ's

---

[6] American Academy of Dermatology Association, *Skin Conditions by the Numbers,* https://www.aad.org/media.

[7] JL Burton et al., *The prevalence of acne vulgaris in adolescence,* BR J DERMATOL, (1971), 85(2):119–126.

[8] *Id.*

annual revenue was 94.9 billion dollars. JNJ markets itself as a world leader in pharmaceutical and consumer healthcare innovation and research. In 2022, JNJ spent $14.6 billion on research and development. JNJ's business falls into three areas - pharmaceuticals, consumer health, and medtech. JNJ's BPO Products, i.e., Clean & Clear and Neutrogena, fall under the consumer health umbrella that includes other widely used personal healthcare products such as Band-Aid, Neosporin, Tylenol, Motrin, Sudafed, Benadryl and Zyrtec allergy products and Johnson's and Aveeno baby care line of products. In about 2023, JNJ spun out Kenvue Inc., for its consumer health business.[9] JNJ's Products are marketed and sold online to retail outlets and distributors throughout the world.

48. BPO Products represent one of Defendants' key acne treatment lines and a significant portion of its retail pharmacy revenues, giving Defendants a strong financial incentive to aggressively market these BPO Products despite known degradation risks.

49. BPO is an active ingredient in all of Defendants' BPO Products. To make the finished BPO Products, BPO, a dry white powder, is mixed with other ingredients to create topical drug creams, cleansers, scrubs, and washes for use on the face and body. BPO is formulated into these Products at concentrations up to

[9] Linnane, Ciara, *Johnson & Johnson is Selling Its Remaining Kenvue Shares*, (May 13, 2024), https://www.morningstar.com/news/marketwatch/2024051391/johnson-johnson-is-selling-its-remaining-kenvue-shares.

10%.[10] All of Defendants' BPO Products are manufactured in the same manner. In manufacturing BPO, no use of benzene is required. It is created by treating hydrogen peroxide with benzoyl chloride under alkaline conditions.

50. Defendants' BPO Products are widely used by children and teenagers as a standalone treatment or in combination with other BPO Products. Defendants knew that adolescents are the largest users with users as young as 7-10 years old. Defendants knew that some consumers would use the BPO Products for many years, starting in their teens. Because there is no cure for acne, Defendants knew that consumers with chronic acne would use the BPO Products repeatedly and regularly throughout their lifetime.

51. By marketing the BPO Products directly to children and teenagers, and by providing assurances of safety and efficacy, Defendants knew that adolescents would use the BPO Products repeatedly over long periods, increasing the likelihood of exposure to any pervasive adulterants.

52. Benzene—a known human carcinogen—is a known contaminant in BPO based pharmaceuticals. As discussed in depth below, Defendants' BPO Products systematically degrade to form benzene when exposed to heat and time.

[10] 21 C.F.R. § 333.310(a)

## IV. Evidence of Benzene's Danger

53. Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum.

54. The health hazards of benzene have been recognized for over one hundred years, and the scientific and regulatory communities agree that it is a known human carcinogen with severe consequences to human exposure.

55. The World Health Organization ("WHO") recognizes that, "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and hematological effects." WHO specifically outlines that, "[b]enzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended."[11]

56. The National Toxicology Program confirms benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[12]

---

[11] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010); *see also* WHO, 2019. Preventing disease through healthy environments: Exposure to benzene: a major public health concern. World Health Organization (WHO), available at https://iris.who.int/bitstream/handle/10665/329481/WHO-CED-PHE-EPE-19.4.2-eng.pdf?ua=1 ("Benzene is carcinogenic to humans, and no safe level of benzene can be recommended.").

[12] *Toxicology Profile for Benzene Draft for Public Comment*, U.S. Dept. of Health and Human Services at 93 (Oct. 2024) https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf (emphasis in original) (hereinafter, *Toxicology Profile*).

57. Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[13] As noted by the IARC, "In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence."[14]

58. According to the U.S. Centers for Disease Control and Prevention ("CDC"), the U.S. Department of Health and Human Services has determined that benzene causes cancer in humans. A toxicity assessment by the CDC has shown benzene can harm the central nervous system and may affect reproductive organs.[15] Similarly, the WHO and the IARC have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[16]

---

[13] *Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans* (2017: Lyon, France), at p. 33.

[14] *Id*. at 34.

[15] *Toxicology Profile*, supra note 12, at 93.

[16] *Valisure Detects Benzene in Benzoyl Peroxide*, Valisure (Mar. 5, 2024), https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide.

59. According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[17]

60. The Environmental Protection Agency ("EPA") also recognizes the cancer risks of benzene, noting that "Benzene is classified as a 'known' human carcinogen (Category A) under the Risk Assessment Guidelines of 1986."[18] "[B]enzene is characterized as a known human carcinogen for all routes of exposure based on convincing human evidence as well as supporting evidence from animal studies."[19]

61. A 2010 study titled "Advances in Understanding Benzene Health Effects and Susceptibility" summarized the epidemiological studies of the carcinogenic effects of benzene exposure and an overview of the hematotoxic effects of benzene. The 2010 study concluded: (a) there is probably no safe level of exposure to benzene; (b) exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process; and (c) benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.[20]

---

[17] *Benzene*, Nat'l Cancer Inst. (last visited Jan. 4, 2026), https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[18] *Benzene*, Environmental Protection Agency, https://iris.epa.gov/ChemicalLanding/&substance_nmbr=276 (last visited June 12, 2025).

[19] *Id*.

[20] *See generally,* Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 Annual Rev. of Pub. Health 133 (Apr. 21, 2010),

62. The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[21]

63. The FDA and the National Institute for Occupational Safety and Health ("NIOSH"), part of the CDC, agree that "[e]ven in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[22] NIOSH further identifies the target organs for benzene exposure as: "eyes, skin, respiratory system, blood, central nervous system, bone marrow. Because of this, the CDC recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm.[23]

## V. THE BINDING NATURE OF THE 2 PPM LIMIT

64. Benzene is prohibited in pharmaceutical products except in trace amounts when its presence is unavoidable as part of the manufacturing process—

https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

[21] *Benzene Chemical Fact Sheet*, CDC (Sep. 6, 2024) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[22] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130 Env't Health Perspective (2002), https://pmc.ncbi.nlm.nih.gov/articles/PMC8963516/; see NIOSH Pocket Guide to Chemical Hazards - Benzene, NIOSH https://www.cdc.gov/niosh/npg/npgd0049.html (last accessed Jan. 4, 2026).

[23] *See NIOSH*, supra note 22.

which BPO does not qualify. Thus, under existing federal law, no detectable benzene should be found in BPO products. Furthermore, to extent benzene is unavoidable in BPO, the maximum amount of benzene that may lawfully be present in a drug product is 2 parts per million ("ppm"). The 2 ppm limit is a hard safety ceiling, not a discretionary guideline. Any product that exceeds 2ppm of benzene must be pulled off the market because it is considered an adulterated drug. This rule, which originated in FDA guidance, reflects the international scientific consensus embodied in ICH Q3C, and was adopted by the USP before being incorporated into federal law through the FDCA.

65. Since July 1, 2008, compliance with USP General Chapter <467> *Residual Solvents* has been a statutory requirement under Section 501(b) of the FDCA.[24] As a result, USP standards governing drug quality and purity are binding under federal law. This statutory incorporation ensures that whenever a drug is recognized in the USP—such as benzoyl peroxide—the purity standards set forth in the USP monographs and general chapters become binding federal requirements.

66. USP General Chapter <467> serves as the governing standard for identifying and quantifying organic volatile impurities in drug products, which

[24] 21 U.S.C. 351(b); *see* 21 U.S.C. § 321(j) (defining "official compendium" as United States Pharmacopeia).

specifically includes benzene, and, consistent with FDA guidance, classifies benzene as a Class 1 solvent—a category reserved for "solvents to be avoided" because benzene is a known human carcinogen that can cause cancer.[25] FDA guidance provides that "[s]olvents in Class 1 should not be employed in the manufacture of drug substances, excipients, and drug products because of [their] unacceptable toxicity," and USP <467> accordingly establishes a maximum concentration limit for benzene of 2 ppm in those products where benzene is unavoidable.[26] Consistent with that classification, the FDA requires manufacturers to strictly control benzene in drug products in accordance with ICH Q3C, cGMP, and USP standards, even for non-compendial drugs. This interpretation of the Chapter 467 to all BPO product has been specifically recognized by USP in response to concerns about the presence of benzene in BPO products.[27]

67. That 2 ppm ceiling is further reinforced by USP General Notice 5.60.20, in which the USP mandated that "[a]ll USP and NF articles are subject to relevant control of solvents, even when no test is specified in the individual

[25] *USP 467*, supra note 1, at 1.

[26] *Id.* at 3–4, tbl. 1; *Q3C Tables and List Guidance for Industry*, FDA at 5 (June 2017), https://www.fda.gov/media/71737/download.

[27] *Statement on Third-Party Laboratory Benzene Findings*, U.S. Pharmacopeia (Mar. 11, 2024), https://www.usp.org/news/statement-on-third-party-laboratory-benzene-findings.

monograph," and that solvents be "limited according to the principles defined and the requirements specified in Residual Solvents <467>."[28]

68. BPO is a drug recognized in an official compendium, the USP. The compendial status of BPO products therefore triggers mandatory compliance with USP General Chapter <467> and General Notice 5.60.20, even where no specific residual solvent test is listed in an individual monograph. The USP has issued official monographs for hydrous benzoyl peroxide, benzoyl peroxide lotion, and benzoyl peroxide gel, each of which is subject to these standards.[29]

69. Chapter <467> makes clear that its requirements are not limited to solvents intentionally added during manufacture.[30] It defines residual solvents to include organic volatile chemicals that are “used or produced” during the manufacture of drug substances or the preparation of drug products.[31] Accordingly, benzene formed as a degradant or byproduct of BPO is subject to the same 2 ppm

---

[28] *General Notice 5.60.20 Residual Solvents in USP and NF Articles ¶ 5.60.20*, USP, https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalNoticesandRequirementsFinal.pdf (last accessed Jan. 4, 2026).

[29] United States Pharmacopeia, *Benzoyl Peroxide Lotion* (USP 29–NF 24), http://www.uspbpep.com/usp29/v29240/usp29nf24s0_m8310.html; United States Pharmacopeia, *Benzoyl Peroxide Gel* (USP 29–NF 24), http://www.uspbpep.com/usp29/v29240/usp29nf24s0_m8320.html; United States Pharmacopeia, *Hydrous Benzoyl Peroxide* (USP 29–NF 24), http://www.uspbpep.com/usp29/v29240/usp29nf24s0_m8330.html.

[30] *USP 467*, supra note 1, at 1.

[31] *Id.*

limit and mandatory testing requirements as benzene introduced as a process solvent.[32]

70. As discussed further below, consequently, a BPO product containing more than 2 ppm of benzene falls below the purity standard of the official compendium and is adulterated under 21 U.S.C. § 351(b).

## VI. FDA WARNINGS AND RECALLS OF BENZENE CONTAMINATED PRODUCTS

71. In addition to the statutory requirement, FDA warnings, communications, and regulatory actions confirm that 2 ppm is the limit. And, this is for good reason, because benzene exposures above 2 ppm have been linked to life threatening health issues.

72. Indeed, the FDA has been consistent in its application of the benzene limits discussed above. On April 18, 2018, the FDA issued a Health Hazard Evaluation on two over-the-counter topical pain relievers containing benzene. The evaluation sought to assess "the risks associated with the application of the products [at issue] with levels of benzene ranging between 8 ppm to 60 ppm." In its evaluation, the FDA cited the ICH Q3C guidance document in observing that benzene is a solvent listed in the guidance documents as Class 1 and as a human carcinogen. It further noted that "[i]t is unacceptable for the amount of benzene to

[32] *Id.*

be more than 2 ppm in this product. The main targets of benzene are the nervous system and the blood forming organs with clinical manifestations occurring years after exposure." The FDA concluded that it is "possible that an individual after repeated exposure to this product [at the levels assessed] could experience increased cancer risk from its use." In describing the "degree of the health hazard associated with use of the product by the population most likely to use it," the FDA marked "Life-Threatening (death has or could occur)." In describing the "degree of the health hazard associated with use of the product by the population most at risk," the FDA marked "Life-Threatening (death has or could occur)."[33]

73. In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson. The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm," which "exceed[s] the guideline value provided by ICH [Q3C] and USP" limits, states the report. The evaluation also noted that individuals with altered skin

[33] *CDER Health Hazard Evaluation* at 2-7 (April 18, 2018).

absorption (e.g., infants, elderly, broken skin) and those exposed to benzene from other sources may be at greater risk.[34]

74. In December 2021, the FDA issued a statement alerting manufacturers to the risk of benzene contamination and "remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications (21 CFR 211.84, 21 CFR 211.160). This includes testing of raw materials and finished product batches (21 CFR 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality and purity."[35] The warning continued: "If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"[36]

---

[34] *CDER Health Hazard Evaluation*, CDER (Apr. 6, 2020), https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

[35] *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs*, FDA (last updated July 24, 2025) https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

[36] *Id*. The FDA cannot force a drug manufacturer to recall a contaminated or adulterated drug. *See* https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practice-cgmp ("While FDA cannot force a company to recall a drug, companies usually will recall voluntarily or at FDA's request").

75. This FDA alert was updated on December 27, 2023, and still provides that drug manufacturers "should not release any drug product batch that contains benzene above 2 ppm" and "[i]f any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]"

76. Again, July 24, 2025, the FDA updated its alert, specifically noting that "[b]enzoyl peroxide, a commonly used active ingredient in acne treatment drug products, may degrade into benzene under certain conditions (such as extreme temperatures)" and the "formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life and should be considered when determining the appropriate timing for benzene testing, e.g., testing at release and on stability (21 CFR 211.165, 211.166), and establishment of an appropriate expiration date (21 CFR 211.137)."

77. Over the past three years alone, the FDA has announced over a dozen recalls of various drug and cosmetic products identified as containing "low" or "trace levels" of benzene, including certain hand sanitizers and aerosol drug products like sunscreens and antiperspirants.[37]

---

[37] *See Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene*, FDA (July 14, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol; *Edgewell Personal Care Issues Voluntary Nationwide Recall of Banana Boat Hair & Scalp Sunscreen Due to the Presence of Benzene*, FDA (Jan. 30, 2023)

78. The FDA's warnings are not unreasonable or unwarranted. As with other topically applied products, such as sunscreen, the application of BPO Products specifically increases dermal benzene absorption, thereby increasing the likelihood and severity of harm.[38] Indeed, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[39]

79. All of this guidance leads to only one conclusion, that benzene should not be present in OTC drugs, even in the smallest amounts, unless absolutely unavoidable, due to the serious health risks.

80. Because benzene is highly toxic and even trace levels present unacceptable risks, the presence or formation of benzene in topical OTC drugs such as BPO Products is dangerous and unlawful under federal and parallel state law.

---

https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/edgewell-personal-care-issues-voluntary-nationwide-recall-banana-boat-hair-scalp-sunscreen-due-0; P&G Issues Voluntary Recall of Specific Old Spice and Secret Aerosol Spray Antiperspirants and Old Spice Below Deck Aerosol Spray Products Due to Detection of Benzene, FDA (Nov. 23, 2021) https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice#:~:text=The%20Procter%20%26%20Gamble%20Company%20(NYSE,level%20due%20to%20the%20presence.

[38] *Valisure Detects Benzene in Sunscreen*, Valisure (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/ (last visited June 12, 2025).

[39] *Benzene Chemical Fact Sheet*, supra note 21.

## VII. BENZENE DISCOVERED IN BPO PRODUCTS AT DANGEROUS LEVELS EXCEEDING REGULATORY LIMITS

81. On March 5, 2024, Valisure submitted a public citizens petition to the FDA requesting a recall and suspension of sales of benzoyl peroxide from the U.S. market, based on findings that numerous BPO products contained elevated levels of benzene, a known human carcinogen.[40]

82. Valisure operates an analytical laboratory that is accredited under International Organization for Standardization for chemical testing, and it is registered with the Drug Enforcement Administration.[41] Valisure is an industry leader in independent chemical testing of medications and works with large private healthcare systems such as Kaiser Permanente and government healthcare systems including the U.S. Department of Defense.[42]

83. In its citizens petition, Valisure reported benzene testing results for numerous BPO drug products. For its testing methods, Valisure used gas chromatography-mass spectrometry ("GC-MS"), a highly accurate method also

---

[40] David Light et al, *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Product*, Valisure at 28-29 (Mar. 5, 2024), https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Petition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf (hereinafter, Citizen Petition).

[41] *Id.*

[42] *Valisure Signs Agreement with Department of Defense to Independently Test & Quality Score Drugs,* PR Newswire (Aug. 8, 2023), https://www.prnewswire.com/newsreleases/valisure-signs-agreement-with-department-of-defense-to-independently-test--quality-score-drugs301895301.html.

used by the FDA to detect impurities in drug and cosmetic products like hand sanitizers[43] and sunscreen products.[44] "The GC-MS method described in [Valisure's] petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[45] Valisure further employed Selected Ion Flow Tube-Mass Spectrometry ("SIFT-MS"), to detect benzene released into the air from BPO products, as well as additional orthogonal approaches for confirmation.[46]

84. As reported, Valisure analyzed sixty-six different BPO containing drug products, both prescription and over-the-counter ("OTC"), for the presence of benzene. The BPO Products tested a range of products—creams, lotions, gels, washes, liquids, and bars—from a variety of brands, including Defendants' own BPO Products.[47] Popular products such as Proactiv 2.5% BPO Cream, Target Up & Up 2.5% BPO Cream, Equate Beauty 10% BPO Cream, Equate BPO Cleanser,

---

[43] Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.

[44] *See id.*; *see also GC/MS Analysis Services*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (last accessed Jan. 4, 2026); *see also* Laurenee L. Adeoshun et al, *Laboratory Information Bulletin # 4674, Identification and Quantitation of Benzene Impurity in Sunscreen Product by Headspace Gas Chromatography-Mass Spectrometry Detection (HSGC-MS)*, FDA, https://www.fda.gov/media/169772/download.

[45] *Citizen Petition*, supra note 40, at 10-11 (citations omitted).

[46] *Valisure Signs Agreement*, supra note 42, at 10.

[47] *Citizen Petition*, supra note 40, at 16, 23.

***Neutrogena 10% BPO Cleanser,*** Clearasil 10% BPO Cream, CVS Health 10% BPO Face Wash, Walgreens 10% BPO Cream, La Roche Posay BPO Cream, and ***Clean & Clear 10% BPO Lotion***.

85. To simulate common distributor and consumer use, handling, and storage conditions, Valisure incubated products at three temperatures: 37°C/98.6°F (human body temperature), 50°C/122°F (accelerated shelf-life stability testing),[48] and 70°C/158°F (hot vehicle). The BPO Products were incubated at 37°C for four weeks and 50°C for three weeks with benzene concentrations measured at intervals using GC-MS and reported in parts per million ("ppm"). Valisure measures the samples at days 0, 4, 10, 14, and 18.

86. As demonstrated below, results from this 50°C stability showed that every one of the 66 products, including Defendants' BPO Products, contained some level of benzene ranging from a maximum of 2,000 ppm to 1.8 ppm.[49] These results show that the products were not chemically stable, with benzene formation occurring under temperatures representative of normal storage and use.

87. This stability testing is important, because they are used to determine the expected shelf-life of the product. For example, 43 days at 70°C corresponds to

---

[48] "50°C (122°F) is not only a reasonable temperature that 'the product may be exposed to during distribution and handling by consumers' but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3 months." *Id.* at 18-19 (citations omitted).

[49] *Id*. at 16-18.

approximately three years of typical shelf life for pharmaceutical products. "This means that to achieve the expected minimum shelf life of 3 years for a standard pharmaceutical product, the product should exhibit stability for at least 43 days of 70°C incubation."[50] However, Valisure's testing showed that BPO formulations fail to maintain chemical stability even under these conditions.

88. Valisure's findings and results were published in peer-reviewed literature and submitted to the FDA in Valisure's March 5, 2024 Citizen's Petition on Benzoyl Peroxide.[51]

89. The results are shown below:

**4A**




//

//

//

[50] *Id.* at 28-29.

[51] K. Kucera et al., *Benzoyl Peroxide Drug Products Form Benzene*, 132 Env't Health Perspective (2024); see Valisure Detects Benzene in Benzoyl Peroxide, supra note 17.

**4B**



Benzene (ppm)
0
50
100
150
200
250
300
350
Day 0
Day 4
Day 10
Day 14
Day 18
10.0% Clearasil Cream 839977008050
2.5% Proactiv Cream 735786015282
5.5% La Roche-Posay Cream 883140500759
10.0% PanOxyl Cream 303160228551
2.5% Sandra Lee MD Lotion 854977007063
4.0% PanOxyl Cream 303160227066
10.0% Walgreens Cream 049022152229


**4C**



Benzene (ppm)
0
20
40
60
80
100
120
Day 0
Day 4
Day 10
Day 14
Day 18
10.0% Walgreens Cream 049022152229
10.0% Oxy Cream 310742026726
5.0% Galderma Cream 302995890308
10.0% Vie Naturelle Liquid 857952008345
10.0% Equate Cream 681131199865
10.0% Humane Cream 634543282502
2.5% Proactiv Cream 842944102262
5.0% Differin Cream 302994606009


**4D**



Benzene (ppm)
0
5
10
15
20
25
30
Day 0
Day 4
Day 10
Day 14
Day 18
5.0% Encube Gel 321922022063
10.0% Nixa Skincare Wash 816932029930
4.0% DR SONG Cream 850603005762
4.0% CeraVe Cream 3606000512238
5.0% Mylan Gel 303788688546
10.0% Zapzyt Cream 010768001102
5.0% Urban Skin Rx Cream 852820007413
10.0% Rugby Gel 305361056254

**4E**


Benzene (ppm)
20
18
16
14
12
10
8
6
4
2
0
10.0% Rugby Gel 305361056254
5.0% Perrigo Gel 345802736840
2.5% Glenmark Gel 368462301470
2.5% Oceanside Gel 368682132502
2.5% Taro Gel 351672136734
2.5% Teva Gel 305913916685
5.0% Rugby Gel 305361055257
5.0% Sandoz Gel 307817263681
Day 0
Day 4
Day 10
Day 14
Day 18

**4F**


Benzene (ppm)
16
14
12
10
8
6
4
2
0
5.0% Glenmark Gel 368462486191
2.5% TARO Gel 351672138493
2.5% Taro Gel 351672136437
5.0% Rugby Gel 305361055561
5.0% Sandoz Gel 307817287502
10.0% Rugby Gel 305361056568
5.0% Glenmark Gel 368462486276
10.0% Replenix Gel 358211412021
Day 0
Day 4
Day 10
Day 14
Day 18

**4G**


Benzene (ppm)
6
5
4
3
2
1
0
10.0% Replenix Gel 358211412021
2.5% Acne Free Cream 3606000537231
4.0% CeraVe Cream 3606000512238
2.5% Prasco Gel 366993869483
2.5% TEVA Gel 300936303450
2.5% Galderma Gel 302995906450
10.0% Neutrogena Gel 070501024614
5.0% M.A.D Skincare Gel 853676003093
Day 0
Day 4
Day 10
Day 14
Day 18

**4H**




90. Some BPO products exhibited benzene levels up to 800 times the FDA limit of 2 ppm, reaching as high as 1,700 ppm.[52] The concentration of BPO in the products did not correlate with benzene formation; for instance, Target Up & Up 2.5% BPO Lotion and Proactiv 10% BPO Cream generated similar benzene levels in the range of 600 ppm.

91. Notably, benzene vapor escaped from closed packaging contaminating the surrounding air in some cases, creating additional risk of inhalation exposure.[53] The finding that additional benzene leaked into the surrounding air from the products' containers means the total consumer benzene exposure would be even more dangerous than the levels reported.

92. Valisure concluded that all on-market BPO acne formulations are fundamentally unstable and form unacceptably high levels of benzene under

[52] Kucera, supra note 51, at 1.

[53] *Citizen Petition*, supra note 40, at 28-29.

normal use, handling, and storage temperatures, whereas acne treatment products not formulated with BPO showed no such instability.[54]

93. Valisure's Petition concluded that all on-market BPO acne formulations seem to be fundamentally unstable and form unacceptably high levels of benzene under normal use, handling, and storage temperatures. Importantly, no such evidence was observed for acne treatment products not formulated with BPO.

94. Valisure filed a Citizen's Petition on Benzoyl Peroxide on March 5, 2024[55] with the FDA requesting the FDA Commissioner to immediately demand a recall of all BPO Products formulated with BPO and further to require that drug manufacturers do independent chemical verification.

95. Independent testing conducted on BPO Products purchased by Plaintiffs' counsel similarly shows benzene levels significantly above the FDA's recall threshold of 2 ppm. This repeated evidence shows Defendants' BPO Products are chemically unstable and adulterated at the time of purchase.

## VIII. DEFENDANTS' KNOWLEDGE, MISREPRESENTATIONS, OMISSIONS, AND CONCEALMENT OF MATERIAL FACTS DECEIVED PLAINTIFFS AND REASONABLE CONSUMERS

96. It has been well known for decades that BPO can degrade to benzene, and that the likelihood of this degradation increases with exposure to heat over

---

[54] *Id.*

[55] As of the date of filing this Class Action, Valisure's FDA Petition is still pending.

time—a process was first reported in scientific literature as early as 1936 and has been recognized and addressed in both the acne treatment industry and industries beyond BPO Products.[56] Despite this public information, Defendants have never conveyed this scientific information to the FDA and, thus, it is unlikely that the FDA has known about this issue until the public citizen petition filed by Valisure.

97. This chemical degradation is not an accidental contamination or a manufacturing fluke. Rather, Defendants' BPO Product is a chemically unstable. Benzene is created within the Product because BPO has a well-understood propensity to thermally decompose: it forms two molecules of benzoyloxy radicals, which further decompose into phenyl radicals with the liberation of carbon dioxide, ultimately resulting in the production of benzene.[57] This process is accelerated by exposure to elevated temperatures equivalent to the temperature of hot cars, trucks, shipping containers, or improperly regulated manufacturing facilities. Despite the existence of known scientific methods to stabilize BPO and prevent this degradation, Defendants have failed to implement these necessary steps to prevent benzene formation in their products. This process is illustrated below:

---

[56] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* 19 Helv. Chim. Acta 338 (1936).

[57] *See* Shang-Hao Liu et al., *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide using DSC and TAM III*, 605 Thermochim. Acta 68 (2015).




98. The issue of BPO decomposition into benzene has been previously identified in the acne treatment product industry, even if it has not been shared with the FDA. In 1977, researchers set out to "evaluate the decomposition of benzoyl peroxide" in pharmaceutical gel preparations.[58] The authors initially observed that, "[b]enzoyl peroxide pharmaceutical preparations are widely used in the treatment of acne. However, due to the inherent chemical nature of benzoyl peroxide, degradation of these preparations is often encountered in storage."[59] Citing to Erlenmeyer and Schoenauer's study from 1936 (referenced above), the authors noted that "when heated, benzoyl peroxide, either in pure form or in nonpolar solvents, decomposed to yield dioxide, biphenyl, phenyl benzoate, and *benzene*."[60] Citing additional published literature from 1954, the authors further noted that "[i]n the presence of acetic acid, it decomposed to form carbon dioxide,

[58] J.N. Bollinger, D. Lewis & V.M. Mendez, *Benzoyl Peroxide Stability in Pharmaceutical Gel Preparations*, 66 J. Pharm. Sci. 718 (1977).

[59] *Id*. at 718.

[60] *Id*.

benzoic acid, phenyl benzoic acid, *benzene*, and phthalic acids."[61] The study found that "[a]t both 30 and 40°[62] storage temperatures, benzoyl peroxide was destroyed rapidly (within 1 month) in the presence of ethanol and acidic chelating agents."[63] The authors concluded that "the result of this investigation demonstrated that the stability of benzoyl peroxide in pharmaceutical gel preparation is strongly influenced by the chemical makeup of the formulations and, secondarily, by the storage temperature due to increased reactivity."[64]

99. This known risk was so prevalent that manufacturers actively sought patents to mitigate the formation of benzene in consumer products. In 2008, a patent application was filed to address the stability of organic peroxide compositions, including benzoyl peroxide when used as an active ingredient in pharmaceuticals.[65] The inventors observed BPO's chemical properties, noting that, first, "benzoyl peroxide free radicals can attack the cell walls of the bacteria thus destroying bacteria[, and s]econd, the decomposition of the benzoyl peroxide will result in forming benzoic acid, *benzene*, phenyl benzoate and biphenyls, all such materials can be toxic to cell."[66] The inventors thus noted that BPO's

---

[61] *Id*. (citing M.T. Gladstone, J. Am. Chem. Soc., 76, 1581 (1954)) (emphasis added).

[62] 30° C is 86° F and 40° C is 104° F.

[63] Bollinger, supra note 58, at 718.

[64] *Id*. at 722.

[65] Faryniarz et al., U.S. Patent Application, Number 2009/005439 A1, filed June 23, 2008.

[66] *Id*. at 2 (emphasis added).

decomposition "must be controlled to allow use of solutions while providing sufficient storage life."[67]

100. Similarly, in 1997, the chemical company Akzo Nobel N.V. filed a patent application for "a method for reducing the rate of free benzene and/or benzene derivative formation in BPO formulations based on organic plasticizers, such as pastes, emulsions, suspensions, dispersions and the like."[68]

101. More recently, in 2016, a peer-reviewed study evaluated the excessive use of BPO in wheat flour. Researchers found that heating "BPO in wheat flour . . . decomposed into . . . deleterious substances, e.g., *benzene*."[69]

102. However, this does not mean that all BPO-based acne treatments contain benzene in unacceptable amounts, if at all. Indeed, a 2024 study entitled "Evaluation of Benzene Presence and Formation in Benzoyl Peroxide Drug Products," in the Journal of Investigative Dermatology, tested 111 OTC BPO acne treatments. Each product was tested for native levels of benzene in unopened products stored at room temperature and sourced from six geographically distinct

---

[67] *Id*.

[68] Borys F. Schafran & Bryce Milleville, *Reduction of Benzene Formation in Dibenzoyl Peroxide Formulations*, WO Patent 1997032845A1 (1997), https://patents.google.com/patent/WO1997032845A1/en.

[69] Guo X., et al. *Rapid Determination and Chemical Change Tracking of Benzoyl Peroxide in Wheat Flour by Multi-Step IR Macro-Fingerprinting*, 154 Spectrochim. Acta, Part A. 123 (2016) (emphasis added).

locations in the continental United States."[70] The Study found that "only 38 products, representing 34% of products tested, contained benzene above the conditionally restricted FDA limit of 2 ppm for benzene for drug product."[71] Additionally, the Study further found that:

> Regionality in sourcing did not appear to affect benzene concentration for same product or same lot. Similarly, the age of products as judged by years from labeled expiration does not appear to correlate with benzene concentration for the sampled products. This observation is anecdotal given the relatively small sample size. The results of the products sampled in this study suggest that formulation is likely the strongest contributor to benzene concentrations in BPO drug products that are commercially available because the magnitude of benzene detected correlates most closely with specific brands or product types within certain brands.[72]

103. Put differently, some brands are able to either formulate their BPO-based acne treatments or adopt proper manufacturing controls, to ensure that the BPO does not degrade into benzene during the manufacturing or holding process. But Defendants' BPO products are not one of them.

104. Benzene development in BPO products can be reduced and prevented. Benzene contamination is reduced, or even halted, when BPO is kept at lower temperatures.[73] But even short periods in higher temperatures will lead to increased benzene contamination. The "data suggests that about 9 ppm of benzene

---

[70] Kucera, supra note 50, at 1.

[71] *Id.*

[72] *Id.*

[73] *Id.*

formed per day of incubation and that the concentration of benzene in the product reached 2 ppm within approximately 5 hours of incubation at 50°C [or 122°F]."[74] The key to ensuring safe BPO-based pharmaceuticals is ensuring that the BPO contained therein is stored and processed as the proper temperatures.

105. Defendants market itself as a manufacturer and merchandiser of quality drug and healthcare products. Defendants expend substantial sums of money and resources on science and research, employing high-level scientists, chemists, and researchers to decide which drug products it will sell. Because drug manufacturers are held to the skill and knowledge of an expert in the field, Defendants were required to keep abreast of scientific advances and is deemed to know reliable information that was generally available or reasonably obtainable in the industry.

106. As such, Defendants were aware of the established chemical processes that cause its BPO Products to contain benzene and/or degrade to form benzene when exposed to commonly used temperatures and conditions. Because the scientific community was aware, even if the FDA was not, that BPO degrades into benzene to form benzene when exposed to commonly used temperatures and conditions for nearly 90 years, it is plausible to infer that Defendant—who is held to the standard of a reasonable manufacturer expert—was also aware of this risk at

---

[74] *Id.*

the time the FDA initially approved BPO as GRAS/E in 2010, thus giving rise to a duty test BPO products for benzene. *See Howard v. Alchemee, LLC*, 2024 WL 4272931, at *7 (C.D. Cal. Sept. 19, 2024) (if the scientific community has known for almost 90 years that BPO can degrade into benzene, it is implausible to suggest "the FDA—a federal agency that depends on its 'scientific expertise' to regulate drug safety—was ignorant of a chemical process commonly known among scientists.").

107. Not only was the risk of benzene formation from BPO well established in the scientific literature and recognized across multiple industries, but by the time Defendants marketed and sold the BPO Products, benzene contamination had already become a recognized problem in consumer drug and healthcare products, prompting recalls, regulatory scrutiny, and direct FDA warnings to BPO-containing drug manufacturers, explicitly stating that Defendants had a duty to test for benzene.

108. Beginning in 2020, the FDA worked with manufacturers to identify benzene contamination, resulting in recalls of hand sanitizers, sunscreens, and deodorants. In 2021, independent testing by Valisure of hundreds of sunscreen and after-sun products from 69 brands found that 27 percent of tested batches contained benzene above the FDA's 2 ppm limit. This led to mass recalls of products sold by major retailers, including Johnson & Johnson's Aveeno and

Neutrogena sunscreen lines and CVS private-label after-sun products. Defendants were well aware of these benzene contamination issues affecting comparable OTC drug products, yet Defendants ignored these reports and continued selling BPO Products without testing for benzene.

109. As discussed above, the FDA has also issued warnings directly to benzoyl peroxide manufacturers, notifying them of the risk of benzene degradation and reminding them of their obligations to test for impurities and not sell contaminated products.[75]

110. Defendants knew or should have known that certain ingredients—specifically carbomers and other petroleum-derived substances—are recognized "red flags" for benzene contamination.[76] Because the BPO Products contain these hydrocarbon-derived ingredients, it was reasonably foreseeable that they could yield benzene.

111. Nonetheless, Defendants did nothing to mitigate both the harms presented by benzene adulteration, as a result of BPO's decomposition. Defendants did not conform its manufacturing processes to prevent degradation under normal circumstances that the Products may be used or stored, in violation of federal regulations, rendering the Products dangerous to health when used as

---

[75] *Id.*

[76] *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*, supra note 35.

directed. Any BPO Product that does not "conform to [the] applicable monograph after its effective date is liable to regulatory action."[77] Additionally, Defendants did not do anything to ensure that the Products were manufactured or held in manner to prevent degradation of BPO into benzene. Nor did Defendants properly test its Products to ensure that they did not contain benzene in amounts which exceed federal guidelines. Pursuant to 21 C.F.R. § 211.84, 21 C.F.R. 211.160 and 21 C.F.R. 211.165, Defendant, as a manufacturer of BPO Products, had a duty at all relevant times to test its Products to ensure they conformed to the specifications for identify, purity, strength, and quality. Per the FDA, this duty includes a requirement "to evaluate and test for possible contaminants in [its] products to ensure they meet specifications and are free from harmful contamination, including benzene."[78] This federal duty to appropriately test products is parallel with New York's longstanding law, which provides that "there is no doubt that manufacturers owe a basic duty to inspect and test their products to ensure that

[77] 21 C.F.R. § 330.10(b).

[78] "Limited number of voluntary recalls initiated after FDA testing of acne products for benzene; findings show a small number of products with elevated levels of benzene contamination" | FDA, March 11, 2025 (available at https://www.fda.gov/drugs/drug-safety-and-availability/limited-number-voluntary-recalls-initiated-after-fda-testing-acne-products-benzene-findings-show).

their products are reasonably safe for consumption. Smith v. Peerless Glass Co., 259 N.Y. 292, 296, 181 N.E. 576 (N.Y.1932)."[79]

112. Plaintiffs have information and belief that the benzene contamination within the Products is inherent to Defendants' manufacturing and holding processes, rendering all of the Products uniformly adulterated with benzene.

113. To date, none of Defendants' BPO Products have been recalled due to benzene contamination. The findings from Plaintiff Calzado's and Plaintiff Morgan's personal products (238.29 ppm, 242.86 ppm, 696.83 ppm, and 218.31, respectively) and Valisure's stability testing (50x the legal limit) prove that the benzene detected in Defendants' BPO Products is not a trace impurity, but a massive chemical breakdown of the product's active ingredient caused by Defendants' defective formulation and total lack of stability testing.

114. Had Defendants adequately tested its BPO Products for benzene, it would have discovered that its Products contained benzene at levels above even the FDA's "safe harbor" exception limit of 2 ppm, making the Products illegal to distribute, market, and sell, thus warranting a recall.

[79] *Kramer v. Showa Denko K.K.*, 929 F.Supp. 733, 747 (S.D. N.Y. 1996); *see also In re New York Asbestos Litig*., 738 F.Supp. 66, 70 (E.D. N.Y. 1990) ("Manufacturers are obliged to keep abreast of any scientific discoveries regarding the safety of their products, and are under a duty to 'fully test their products to uncover all scientifically discoverable dangers before the products are sold.'").

115. Defendants sold, and continues to sell, BPO Products during the class period despite its knowledge that its Products contain benzene and/or degrade to form benzene at levels which exceed FDA guidelines and pose a threat of serious adverse effects on consumers.

116. Defendants have engaged in deceptive, untrue, and misleading advertising by failing to warn about the presence of benzene in its BPO Products.

117. Accordingly, Defendants knowingly, recklessly, or at least negligently, introduced the contaminated, adulterated, and misbranded BPO Products into the U.S. market.

## IX. BENZENE RENDERS THE BPO PRODUCTS ADULTERATED, MISBRANDED, AND ILLEGAL TO SELL

118. The BPO Products are "drugs" used to treat acne (i.e., *acne vulgaris*), formulated with a chemical called benzoyl peroxide, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the BPO Products must be made in conformity with the FDCA's applicable monograph, current good manufacturing practices, and must conform to quality, safety, and purity specifications under relevant USP provisions.

119. While most drugs must be approved for sale individually, the monograph system allows manufacturers to bypass individualized review.[80] Using

[80] *See* 21 U.S.C. § 355h; 21 C.F.R. § 330.10.

administrative orders, the FDA issues a monograph for a therapeutic class of over-the-counter drug products, which provide the conditions necessary for the drug to be considered generally safe and effective ("GRASE").[81] "Any product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." 21 C.F.R. § 330.10(b).

120. Acne medications containing BPO are regulated under the FDA's monograph for over-the-counter acne drug products ("Acne Monograph"), codified at 21 C.F.R. § 333.301 *et seq*.

121. The Acne Monograph states that a BPO product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart and each general condition established in § 330.1 of this chapter."[82]

122. Section 330.1, in turn, requires all products subject to a monograph to be "in compliance with chapter V of the [FDCA,]" which prohibits the sale of adulterated or misbranded drugs.[83]

123. A drug is misbranded if the label is "false or misleading in any particular."[84] This includes failing "to reveal facts material . . . which may result

---

[81] *Id.*

[82] *See* 21 C.F.R. § 333.301(a).

[83] 21 C.F.R. § 330.1(c)(1); 21 U.S.C.§§ 351, 352.

[84] 21 U.S.C. § 352(a)(1); Cal. Health & Safety Code § 111330; LSA-R.S. 40:617(1);

from the use of the article under such conditions of use as are customary or usual," or including a component "dangerous to health under the conditions of use prescribed in the labeling or advertising thereof."[85]

124. Under 21 U.S.C. § 351(a), a drug may adulterated under federal and various state laws if, "it consists in whole or in part of any filthy, putrid, or decomposed substance"[86]; "it has been produced, prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health"[87]; or "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with

---

R.C.N.Y. Health Code § 71.05(f)(1); Mo. Rev. Stat. § 196.100(1) (adopting labeling requirements contained in FDCA and any regulations promulgated thereunder); *see also* Mo. Rev. Stat. § 196.101(2) (drug may be misbranded if its "labeling is misleading"); N.Y. Gen. Bus. § 350, *et seq*. ("False advertising in the conduct of any business, trade or commerce…in this state is hereby declared unlawful"); N.Y. Gen. Bus. § 349, et seq ("Deceptive acts or practices in the conduct of any business, trade or commerce … in this state are hereby declared unlawful").

[85] 21 U.S.C. § 352(j); Cal. Health & Safety Code § 111400; Mo. Rev. Stat. § 196.100 (adopting FDCA labeling requirements); LSA-R.S. 40:617(2); Mo. Rev. Stat. § 196.015(5) ("the manufacturer, distributor or seller engages in "[t]he dissemination of any false advertisement"); Cal. Health & Safety Code § 110390; LSA-R.S. 40:625; *see also* Cal. Health & Safety Code § 110395 (unlawful for any person to manufacture, sell, deliver or offer for sale any drug that is falsely advertised); N.Y. Gen. Bus. § 350, *et seq*. ("False advertising in the conduct of any business, trade or commerce…in this state is hereby declared unlawful").

[86] 21 U.S.C. § 351(a)(1); Mo. Rev. Stat. § 196.095(1); LSA-R.S. 40:616(1); Cal. Health & Safety Code § 111250; 24 R.C.N.Y. Health Code § 71.05(e)(3).

"[87] 21 U.S.C. § 351(a)(1); Cal. Health & Safety Code § 111255; Mo. Rev. Stat. § 196.095(1); LSA-R.S. 40:616(2); R.C.N.Y. Health Code § 71.05(e)(4). *See also* Mo. Rev. Stat. § 196.010 (the term "contaminated with filth" applies to any drug not reasonably protected from "injurious contaminations").

***current good manufacturing practice*** to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."[88]

125. In addition, pursuant to 21 U.S.C. § 351(b) (Section 501(b) of the FDCA incorporating USP General Chapter 467), a drug is legally deemed adulterated if it is recognized in an "official compendium" and its quality or purity falls below the standards set forth in that compendium.[89] Under 21 U.S.C. § 321(j), the term "official compendium" includes the United States Pharmacopeia and incorporates USP standards by reference, effectively turning these scientific standards into federal law.

126. Relevant to this case, this means Defendants are not only bound by the general safety provisions in 351(a)(1), but Defendants are also bound by the USP binding regulations under 351(b). These regulations strictly prohibit benzene in excess of 2 ppm and require specific testing to ensure compliance. Here, Plaintiffs allege that Defendants not only failed to conduct the requisite USP

---

[88] 21 U.S.C. § 351(a)(2).

[89] 21 U.S.C. § 351(b); Mo. Rev. Stat. § 196.095(6); Cal. Health & Safety Code § 111280; Cal. Health & Safety Code § 111285; LSA-R.S. 40:616(6); R.C.N.Y. Health Code § 71.05(e)(7), (8) .

testing but also released BPO products into the stream of commerce containing benzene levels far exceeding the 2 ppm limit.

127. Furthermore, independent of the final benzene concentration, the cGMP binding regulations require manufacturers to implement process controls, purity and stability testing, and rejection of contaminated batches to ensure the drug product remains safe and pure throughout its shelf life. Here, Plaintiffs allege that Defendants' failure to test for benzene formation during stability studies constitutes a per se failure to conform to cGMPs, rendering the products adulterated as a matter of law regardless of the ultimate test results.

128. Although they are different theories of adulteration, these provisions in Sections 351(a) and (b) often work hand-in-hand. When a drug is manufactured, stored, or distributed in violation of applicable standards, including the Current Good Manufacturing Practices, such violations can result in chemical decomposition or loss of purity under § 351(a), rendering the product potentially injurious to health. That same loss of purity may also cause the drug to fail to meet binding quality and purity standards established by the USP Chapter <467>, rendering the product independently adulterated under § 351(b).

129. For example, although benzene is best avoided altogether, as explained above, the FDA sets a hard limit of 2 ppm through incorporation of USP

<467>.[90] Under 21 CFR 211.160 and 211.165, manufacturers must use "scientifically sound and appropriate specifications" and "test procedures" to ensure drug products conform to standards of purity, including the 2 ppm limit, and USP <467> mandates that drug manufacturers, including BPO Products manufacturers, conduct specific types of testing for benzene contamination and product purity.[91] Additionally, the USP's benzene "standards are applicable during the entire shelf life of the product, not just at the time of release."[92]

130. Thus, the Acne Monograph expressly incorporates the general misbranding and adulteration requirements under 21 U.S.C. §§ 351 and 352. Further, Section 351 mandates compliance with the cGMPs and "official compendiums," such as those published by the USP.[93]

131. Because the Monograph conditions a product's "generally recognized as safe and effective" status on compliance with the adulteration and misbranding provisions of the FDCA, a drug manufactured in violation of the Section 351 or

---

[90] *USP 467*, supra note 1, at 2; *Q3C Tables*, supra note 28, at 5.

[91] 21 C.F.R. § 211.160, 211.165; *USP 467*, supra note 1, at 2 ("Testing of drug substances, excipients, and drug products for residual solvents should be performed when production or purification processes are known to result in the presence of such residual solvents.")

[92] *See* supra note 29, USP Statement on Third Party Laboratory Benzene Findings.

[93] "The term 'official compendium' means the official United States Pharmacopœia, official Homœopathic Pharmacopœia of the United States, official National Formulary, or any supplement to any of them." 21 U.S.C. § 321(j).

352 provisions, the cGMPs, or the applicable USP provisions is, by definition, a drug that failed to comply with the Monograph itself.

**A. Adulterated Drugs Are Illegal to Sell**

132. Defendants' BPO Products are adulterated under 21 U.S.C. § 351 by the presence of benzene in Defendants' BPO products because: (1) benzene is a decomposed or filthy substance found in Defendants' BPO products pursuant to §351(a)(1); (2) benzene's presence in Defendants' BPO resulted from inadequate methods, facilities, testing, and/or controls in violation of current good manufacturing practice under §351(a)(2)(B); and (3) Defendants did not ensure its BPO Products met the purity standards (2 ppm benzene) under USP General Chapter 467 as incorporated by 21 U.S.C. § 351(b), rendering the products adulterated.

**1. Adulterated Under 351(a)(1)-(2) by the Mere Presence of Benzene**

133. The presence of benzene in the BPO Products renders the Products adulterated and, thus, illegal to sell. As such, the BPO Products have no economic value and are worthless. This the same prohibition of the sale of worthless drugs imposed by state consumer protection laws. Worse, as manufactured, the levels of benzene contained in the BPO Products are dangerous to health under the conditions of use prescribed in the labeling and advertising.

134. Independent testing conducted by Valisure and Plaintiffs' counsel demonstrates that Defendants' BPO Products contained benzene levels ranging from 1.8 ppm to over 2,000 ppm, far exceeding the FDA's 2 ppm limit for unavoidable residual solvents. The formation of benzene reflects chemical decomposition of the BPO Products, meaning the Products consist, in part, of a decomposed and unsafe substance, rendering them adulterated under federal law.

135. The BPO Products sold by Defendants systematically degrade to form benzene when exposed to normal and expected handling, storage, and use, including elevated temperatures encountered during shipping, in vehicles, bathrooms, and during application to the skin. Because benzene is a known human carcinogen and is not an intended component of the BPO Products, its presence constitutes a decomposed substance under 21 U.S.C. § 351(a)(1).

136. Defendants knew, or should have known, through industry research, scientific literature, and stability studies, that BPO-containing formulations degrade into benzene, yet continued to market and sell the Products without adequate testing or rejection of affected batches. By distributing Products containing benzene, Defendants introduced drugs that contain a decomposed, unsafe substance into commerce, in direct violation of Section 351(a)(1).

**2. Adulterated as a Result of cGMP Violations**

137. Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" and may not be distributed or sold in the United States. *See* 21 §§ 330.1, 351(a)(2)(B), 210.1(b). States have enacted laws adopting or mirroring these federal standards. *See* Section VIII, *infra.*

138. The cGMPs are the "minimum [requirements] for methods to be used in, and the facilities or controls to be use for, the manufacture, processing, packaging, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and … meets the quality and purity characteristics that it purports or is represented to possess." 21 CFR § 210.1(a).

139. As discussed above, benzene is a "Class 1 residual solvent," a specific subclassification of "impurities"[94] manufacturers are required to monitor and control.[95] Indeed, the FDA explicitly ties the removal of residual solvents to cGMP compliance, stating that "all residual solvents should be removed to the extent possible to meet . . . good manufacturing practices."[96]

[94] Unlike ingredients, which are purposely added, impurities may "arise during the synthesis, purification, and storage of a new drug substance." *Sandoz Inc. v. Becerra*, 57 F.4th 272, 283 (D.C. Cir. 2023); *see Guidance for Industry: Q3A Impurities in New Drug Substances*, FDA at 9 (June 2008), https://www.fda.gov/media/71727/download ("Impurity: Any component of the new drug substance that is not the chemical entity defined as the new drug substance"; "Potential Impurity: An impurity that theoretically can arise during manufacture or storage. It may or may not actually appear in the new drug substance.").

[95] *See Q3C Tables*, supra note 26, at 2.

[96] *Q3C(R8) Impurities: Guidance for Residual Solvents*, FDA at 2 (Dec. 2021),

140. Benzene specifically is restricted by the FDA, through incorporation of USP chapter <467>, to 2 ppm where its use in manufacturing "is unavoidable in order to produce a drug product with a significant therapeutic advance."[97] Except in such "limited cases," Class 1 solvents such as benzene should not be employed in the manufacture of drug substances or drug products "because of their unacceptable toxicity."[98] Defendants' BPO Products do not meet this safe harbor exception. This is because the use of benzene in the manufacture of the BPO Products is not "unavoidable," nor does the use of benzene in BPO Products provide a "significant therapeutic advance."

141. The presence of benzene in Defendants' BPO Products is not inherent or unavoidable, but rather the direct result of Defendants' failure to comply with the bare "minimum," the cGMPs, which are designed to ensure drug purity, stability, and consumer safety.

142. Defendants could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients, and the BPO Products could have been sold with absolutely no benzene in them. Specifically, BPO as a raw material is known to be thermally

https://www.fda.gov/media/138334/download.

[97] *USP 467*, supra note 1, at 2; *Q3C Tables*, supra note 26, at 5.

[98] *Q3C*, supra note 96, at 2.

stable at purities as high as 75% up to temperatures of 98°C.[99] Valisure also evaluated pure BPO reference powder in its GC-MS analytical system and found no evidence of the instability and formation of benzene seen in formulated final products of BPO containing acne treatments.[100] Thus, if BPO is inherently stable as a pure, crystalline powder, a reformulated product that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could potentially be developed.[101]

143. This is supported by the FDA's July 2021 Health Hazard Evaluation, which concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment of a body function," were "likely to occur" at exposure levels of between 11.2 to 23.6 ppm benzene.[102] Defendants' BPO Products, as tested by Valisure and by Plaintiffs in this case, contain benzene above these "life-threatening" levels.

144. Further, as manufacturers, distributors, and sellers of acne treatment products, Defendants had and has a duty to ensure that its BPO Products did not and do not contain excessive (or any) level of benzene, including through regular

[99] *Valisure Citizens Petition*, supra note 40, at 25 (citation omitted).

[100] *Id.*

[101] *See id.* at 25-26.

[102] *CDER Health Hazard Evaluation*, CDER (Apr. 6, 2020), https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment

testing, especially before injecting the BPO Products into the stream of commerce for consumers to use on their skin.[103] This includes testing of raw materials, stability testing, and finished product batches prior to release to ensure they meet appropriate specifications for identity, strength, quality, and purity.[104] But Defendants made no reasonable effort to test its BPO Products for the presence of benzene or test whether the Products could degrade into benzene over the course of the shelf-life of the Products.[105]

145. Defendants' BPO Products did not conform to its final monograph specifications after its effective date, which demonstrates inadequate production, process, and quality oversight by Defendant. 21 C.F.R. § 330.10(b).

146. Thus, upon information and belief, based on the high levels of benzene discovered in testing and the chemical instability of Defendants' formulation, Defendants violated the following state law requirements, which parallel and incorporate federal cGMPs:

**a. Failure to Establish Scientifically Sound Specifications (21 C.F.R. §§ 211.160, 211.87, 21 C.F.R. § 211.100).**

Defendants were required to establish and/or follow "test

[103] 21 CFR §§ 211.84, 211.160; *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*, supra note 35.

[104] 21 CFR §§ 211.165, 211.166; *see FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*, supra note 35.

[105] 21 CFR §§ 211.137, 211.166; *see FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*, supra note 35.

procedures, or other laboratory control mechanisms" to "assure that components"[106] (including the active ingredient, raw BPO), in-process materials, labeling, and drug products conform to appropriate standards of identity, quality, and purity." However, Defendants failed to assure component purity for BPO via mandated testing and retesting procedures to assess BPO degradation.[107] Because raw BPO is stable up to 98°C, upon information and belief, Defendants did not establish specifications for raw BPO and did not conduct retesting of BPO, which is known to be "subject to deterioration" into benzene due to heat exposure during shipping or storage, to ensure they were free from benzene precursors or existing contamination.

Moreover, upon information and belief, Defendants failed to establish necessary purity specifications for known degradants.[108] Because it has been known since at least 1936 that the BPO molecule is thermally unstable and degrades into benzene, Defendants had been repeatedly warned by the FDA, and it is required on the FDCA's incorporation of USP <467> standards, Defendants' specifications

[106] "Component means any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product." 21 C.F.R. § 210.3(3).

[107] 21 C.F.R. § 211.160(b)(1).

[108] 21 C.F.R. § 211.160(b).

must include a maximum threshold for benzene formation (2 ppm)—the limit set by the FDA that manufacturers must adopt. Defendants chose not to have any such purity standard for benzene, choosing instead to ignore a known chemical pathway with a mandatory cap in favor of cheaper, less rigorous testing protocols.

This failure fundamentally violates the requirement to establish laboratory control mechanisms to assure drug products conform to standards of identity and purity (21 C.F.R. § 211.160(a)-(b), 21 C.F.R. § 211.100) and to retest components subject to deterioration (21 C.F.R. § 211.87).

**b. Failure to Maintain Facilities and Temperature Controls (21 C.F.R. § 211.142).**

CGMPs require the "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products is not affected," as required by 21 CFR § 211.142(b). The instability in Defendants' BPO products arises due to, in part, improper manufacturing or holding conditions (e.g., improperly refrigerated shipping or warehouse storage). Upon information and belief, Defendants violated the cGMPs by shipping and holding BPO Products in inadequately refrigerated environments, effectively catalyzing the formation of benzene before the product reached Plaintiffs.

Upon information and belief, Defendants did not conduct stability testing satisfactorily, and Defendants' lack of stability testing makes compliance with USP <1079> a physical and legal impossibility. USP <1079> states that environmental controls are "key" to maintaining drug safety and quality, and that "[t]emperature is one of the most important parameters to control."[109] USP <1079> explicitly states that "drugs must be stored and transported according to predetermined conditions (e.g., temperature) **as *supported by stability data*.**"[110] While USP <1079> allows for brief "temperature excursions" outside of labeled storage conditions, such excursions are only acceptable ***"provided that stability data and scientific/technical justification exist"*** to prove that product safety and quality are not affected.

Because Defendants did not conduct stability testing for benzene formation, upon information and belief, it possesses no "stability data" or "scientific/technical justification" to excuse the temperature spikes its products experienced during shipping and storage.[111] Consequently, any temperature excursion—no matter how brief—rendered the BPO Products adulterated because Defendants had no data to ensure that such heat exposure would not trigger the degradation of BPO into benzene. By shipping these products without the refrigerated controls required for a thermally unstable molecule, and without the stability data required by USP <1079> to justify that

[109] *USP <1079>*, https://www.usp.org/sites/default/files/usp/document/supply-chain/apec-toolkit/USP%20GC1079.pdf.

[110] *Id.*

[111] *Id.*

failure, Defendants directly violated 21 C.F.R. § 211.142.

**c. Failure to Utilize "Meaningful and Specific" Stability Test Methods (21 C.F.R. § 211.166).**

Federal regulations require drug manufacturers to maintain a written stability testing program using "reliable, meaningful, and specific test methods." Defendants' stability testing program omitted testing for benzene and therefore failed to evaluate a known and well-documented degradation pathway of the active ingredient. A stability program that excludes assessment of a purity attribute subject to an established numerical limit is incapable of providing meaningful or specific information regarding product stability and does not satisfy the requirements of 21 C.F.R. § 211.166. By omitting benzene from its stability program, Defendants violated the mandate for "reliable, meaningful, and specific test methods" (21 C.F.R. § 211.166).

**d. Failure to Test Components, Investigate Unexplained Discrepancies, and Reject Adulterated Lots (§§ 211.84(d), 211.165, 211.192, 211.67, 211.100, 211.110):**

The cGMPs establish a mandatory "gatekeeper" process to ensure that adulterated drugs never reach consumers. The cGMPs require that each batch be tested prior to release and that any batch showing an unexplained discrepancy or failure to meet specifications be rejected. But, Defendants skipped these mandated tests for the specific batches purchased by Plaintiffs, and illegally released the contaminated batches anyway.

First, federal law mandates that for each batch of drug product, there "shall be appropriate laboratory determination of satisfactory conformance to final specifications" prior to release (§ 211.165(a)).

By failing to establish adequate acceptance criteria, control procedures to validate performance of manufacturing processes, or conduct testing for benzene—a known degradant— before release, Defendants could not "assure that batches of drug products meet each appropriate specification" required for approval and release (§ 211.165(d), § 211.110, § 211.100). Second, the Quality Control Unit ("QCU") has an affirmative duty to "thoroughly investigate" any "unexplained discrepancy" or failure of a batch to meet specifications, "whether or not the batch has already been distributed." Because the instability of BPO and its degradation into benzene is a scientifically documented "discrepancy," the QCU's failure to review production records or investigate this degradation pathway constitutes a systemic failure to determine compliance with established procedures (§ 211.192).

Finally, Defendants were required (1) to test or examine sample lots of components—such as active ingredients like BPO—for conformity with all written specifications for purity, strength, and quality before release or sale for use; and (2) to reject sample lots of components that did not meet the written specifications for identity, quality and purity and related tests (§ 211.84). Defendants failed to test its active ingredient BPO for the presence of benzene in violation of the affirmative testing duties mandated by cGMPs and USP <467>. Defendants adequately tested its BPO Products for benzene, it would have discovered that its Products contained benzene at levels above even the FDA's "safe harbor" exception limit of 2 ppm, making the Products illegal to distribute, market, and sell, thus warranting a recall.

**e. Expiration Dates Not Supported by Stability Data (21 CFR § 211.137).**

Defendants are required under cGMPs to ensure that its products meet standards of purity at the time of consumer use, which in turn requires assigning an expiration date supported by stability data. Stability testing must evaluate whether the drug product remains safe and pure throughout its shelf life under all expected distributor and consumer storage, handling, and use conditions, using "reliable, meaningful, and specific" test methods.[112]

It is well known that chemical ingredients may degrade over time or in response to environmental factors such as temperature, light, moisture, and humidity, and any stability testing demonstrating degradation or formation of toxic byproducts renders the product unfit for sale. This requires an expiration date related to the specific storage conditions on the label.

Defendants' expiration dates are legally invalid because they are not supported by stability testing data showing that the BPO Products remain below 2 ppm benzene when stored over that time period. By omitting benzene from its stability program, Defendants violated the mandate for "reliable, meaningful, and specific test methods" (21 C.F.R. § 211.166) and the requirement that expiration dates be supported by such data (21 C.F.R. § 211.137).

[112] 21 CFR § 211.166.

147. Past FDA regulatory action demonstrates that these types of violations are of the type to render products adulterated and thus illegal to sell. For example, in 2022, the FDA sent a "warning letter" to a company that manufactured hand sanitizers found to be contaminated with "approximately 12 ppm benzene," which the agency alleged "demonstrate that the drug product contained impurities at unacceptable levels." This level of benzene contamination prompted the agency to "recommend [the company] consider removing the adulterated batches … currently in distribution from the U.S. market." The agency alleged that, because benzene contamination is a known risk of the manufacturing process, the company's failure to test its product for benzene was a violation of cGMPs. Specifically, the FDA alleged the company

> failed to conduct impurity testing, including … [for] benzene, of active pharmaceutical ingredients or your finished … drug products prior to distribution. Because these impurities are a known risk of the manufacturing process, a *finished product specification for these impurities in [the company's products] is appropriate* under [cGMP] 21 CFR 211.160(b). Further, *finished product testing of each batch of drug product is required under [cGMP] 21 CFR 211.165.*
>
> *The contamination with benzene* … in drug products manufactured in your facility, in addition to your failure to conduct impurity testing of your drug products prior to distribution, *demonstrate that the quality assurance within your facility is not functioning in accordance with CGMP requirements* under section 501(a)(2)(B) of the FD&C Act.[113]

[113] *Warning Letter Salon Technologies International, Inc.*, FDA (Dec. 21, 2022), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/salon-technologies-international-inc-630566-12212022.

148. Similarly, in October 2025, the FDA sent a "warning letter" to Owen Biosciences, Inc. stating that the agency had "sampled and tested one lot" of the company's benzoyl peroxide acne treatment product which revealed the product "contained excessive benzene impurity levels of more than 20 ppm."[114] The FDA alleged this level of benzene contamination rendered the product "adulterated" and "recommend[ed] removal of this product lot from the U.S. market[.]" Owen responded that it was "not aware of any FDA guideline on benzene testing." Citing the FDA alert, first published in December 2021, the agency rejected that assertion, stating "FDA has alerted drug manufacturers of products at risk for presence of benzene that they should be testing those drug products for benzene."

149. In short, the cGMPs *require* that "drug manufacturers with a risk for benzene contamination" test their drugs for benzene. As alleged, there is a risk for benzene contamination in the manufacturing of benzoyl peroxide, a scientific fact that has been known for decades.

150. Upon information and belief, Defendants did not test its BPO Products for benzene.

151. Defendants sold, and continues to sell, BPO Products during the class period despite its knowledge that its Products were made in violation of the

[114] Ex. 1, FDA Letter to Owen Biosciences, Inc.

cGMPs, rendering the BPO Products adulterated and posing a threat of serious adverse effects on consumers.

152. Defendants' failure to conform to cGMPs resulted in the production, and ultimate sale to consumers, of BPO Products that were so highly contaminated and/or adulterated with benzene that they could not be legally sold in the United States, yet Defendants still falsely labeled and marketed its illegal Products as compliant with state and FDCA drug regulations. That Defendants' BPO Products were able to reach the U.S. market with such high levels of benzene indicates that there was a critical failure in Defendants' quality control and testing protocols as required by the above-referenced cGMPs as incorporated into state law.

**3. Adulterated Under 351(b) by Exceeding the 2 PPM Limit**

153. The BPO Products are further adulterated under 21 U.S.C. § 351(b) because their purity falls below the official standards set forth in the USP.

154. Pursuant to 21 U.S.C. § 351(b) (Section 501(b) of the FDCA), a drug is legally deemed adulterated if it is recognized in an "official compendium" and its quality or purity falls below the standards set forth in that compendium. The Act further mandates that any determination of a drug's purity "shall be made in accordance with the tests or methods of assay set forth in such compendium." Under 21 U.S.C. § 321(j), the term "official compendium" is defined to include the official United States Pharmacopoeia and the National Formulary. The FDCA

incorporates the standards of the USP by reference, effectively turning these scientific standards into federal law

155. Defendants' BPO Products are definitively subject to the USP compendium, which includes specific monographs for hydrous benzoyl peroxide, benzoyl peroxide lotion, and benzoyl peroxide gel.[115] Regardless, USP General Notice 5.60.20 mandates that all USP articles are subject to the requirements of Chapter <467> "even when no test is specified in the individual monograph."[116]

156. USP Chapter <467> is not limited to solvents added as ingredients; it explicitly defines residual solvents as organic volatile chemicals that are "used or produced" in the manufacture of drug substances or in the preparation of drug products.[117] Defendants' BPO Products are adulterated because they contain benzene—a degradant of the active ingredient BPO—that is produced as a byproduct during the manufacturing, processing, or holding of the drug. Thus, the toxicity and residual level of this produced benzene must be limited according to the 2 ppm threshold defined in Chapter <467>.

---

[115] *USP Monographs*, supra note 29.

[116] General Notice 5.60.20, supra note 28.

[117] *USP 467*, supra note 1, at 1.

157. Because Defendants' BPO Products contain benzene well in excess of this limit, they fail the mandatory purity standards of the official compendium, rendering them per se adulterated under Section 351(b).

158. Defendants' failure to conduct the specific validated testing required by USP <467>, which ***explicitly requires Defendants to test for benzene*,**[118] while continuing to represent the products as "USP" grade constitutes a direct violation of federal and parallel state law.

159. Despite this awareness and capability, Defendants failed to comply with USP <467>, which establishes a specific, binding limit for benzene contamination and mandates appropriate testing for residual solvents. This selective noncompliance allowed benzene to remain undetected and unaddressed in Defendants' benzoyl peroxide products, resulting in products that fell below required standards of quality and purity and were adulterated under federal and state law.

### B. Defendants' BPO Products Are Misbranding by Omitting Benzene's Presence and Placing Additional, Misleading Labels

160. Defendants' BPO Products are misbranded under 21 U.S.C. § 352 because the labeling is false, misleading, and incomplete. The Product labels, packaging, and advertising, market the Products as safe and effective yet fail to

---

[118] *Id.* at 1-2

disclose the presence of benzene or the risk of benzene formation. Accordingly, the BPO Products are misbranded under 21 U.S.C. § 352 and illegal to sell.

161. Importantly, BPO Products are not designed to contain benzene, and no amount of benzene is acceptable in acne treatments like those manufactured, distributed, and sold by Defendant.

162. Defendants failed to disclose that BPO is an inherently unstable molecule that decomposes into benzene—a known human carcinogen—under ordinary storage conditions and well within the product's expected shelf life.

163. This omission occurred on the physical front and back labels of the Defendants BPO Products, marketing materials, on the product descriptions on Defendants.com, and on point-of-sale shelf tags in Defendants retail stores where the products were displayed. This omission was continuous throughout the Class Period and the relevant times periods Plaintiffs purchased the BPO Products.

164. Defendants' BPO Products degrade to benzene under normal and expected handling, use, or storage, including the common and foreseeable storage of acne treatments in bathrooms where the products are frequently exposed to elevated temperatures and humidity from hot showers. Defendants did not warn the public about the risk of benzene contamination or the health risks of exposure. Defendants never disclosed benzene, or that the Product was at risk of degradation,

on any of its Products, labels, containers, websites or packaging. This marketing was and continues to be misleading, fraudulent, and dangerous.

165. In the absence of a warning, consumers trust Defendants, because JNJ is a household name, who represents itself as a trustworthy manufacturer. Indeed, JNJ marketed itself as a world class pharmaceutical and consumer health care product researcher, developer, and seller who devoted substantial resources to product development. In 2023 alone, JNJ reported that it spent $14.6 billion on research and development.

166. Defendants marketed itself as a company committed to safety and science. JNJ told consumers: "we are driven by a responsibility to create science-backed skin care that everyone can access."[119] On JNJ's website for Neutrogena®, JNJ said they "set a high bar for using ingredients…screening for quality, manufacturing process, government regulations, published and research."[120] JNJ assured consumers, BPO is the number one dermatologist approved over the counter acne ingredient.[121]

[119] Johnson & Johnson Consumer Inc., Neutrogena, *Why Neutrogena?* https://www.neutrogena.com/why-neutrogena.html, (last visited October 7, 2023).

[120] Johnson & Johnson Consumer Inc., Neutrogena, *Product Testing,* https://www.neutrogena.com/ producttesting.html (last visited October 7, 2023).

[121] *See* Neutrogena Stubborn Acne AM Treatment container.

167. Defendants' broad claims of safety gave consumers a false sense of safety. Defendants' statements were meant to convey the BPO Products were safe and did not contain carcinogens such as benzene. Defendants made these statements uniformly to the public and through their websites, BPO Products' labels, containers, and advertising.

168. By marketing it as a safe "treatment," Defendants created the misleading impression that the product was chemically stable. Plaintiffs read the label and, because the label failed to mention benzene or the risk of degradation, Plaintiffs reasonably believed the product was safe for its intended use. Had Defendants disclosed the truth, Plaintiffs would not have purchased it, or would have paid significantly less for it.

169. Because the presence of benzene is dangerous and not disclosed, and because the product is marketed as safe and generally recognized as effective under the Acne Monograph, the BPO Products are misbranded.

**X. State Laws Parallel Existing Federal Requirements**

170. The federal violations of the FDCA, cGMPs, and USP standards detailed in Section I provide the mandatory safety and purity benchmarks for the BPO Products, but Plaintiffs' claims for relief are brought exclusively under state law.

171. The laws of every state and U.S. territory where Defendants' BPO Products were sold impose independent, affirmative duties on drug manufacturers. These state-law duties ensure that consumers receive drugs made in accordance with the very same cGMP and official compendium standards established under federal law. This state-level regulatory framework is "fully consistent with" federal requirements because the vast majority of these jurisdictions have enacted "mini-FDCA" statutes that explicitly adopt the federal definitions of adulteration and misbranding as the state's own legal standard.

172. These state-law duties are "parallel" to the FDCA because they require exactly what the federal law requires: compliance with the USP and cGMPs. By distributing BPO Products that fail to meet the rigorous purity and manufacturing standards mandated by these various state-level enactments, Defendants' conduct constitutes a clear and actionable breach of the independent laws of each state where these adulterated products were sold.

173. The states and territories whose statutes adopt, incorporate, or parallel[122] these federal requirements include:

- **California Health and Safety Code §§ 110105** (cGMPs): All good manufacturing practices regulations for any food, drug, device, or cosmetic

[122] To be parallel to federal law, a state-law claim need only be "equivalent to, and fully consistent with," federal law. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 447 (2005). It need "not be phrased in the *identical* language as its corresponding [federal] requirement." *Id*. at 454 (emphasis in original). *See also Hardeman v. Monsanto Co*., 997 F.3d 941, 955 (9th Cir. 2021) (quoting *Bates, supra*, for same proposition).

and any amendments to the regulations adopted pursuant to the federal act in effect on November 23, 1970, or adopted on or after such date, are the good manufacturing practices regulations of this state. If the department finds that it is necessary for the protection of consumers, it may adopt interpretative regulations as necessary to define 'current good manufacturing practice' as used in this part."

• **Chapter 410, Illinois Statute § 620/14** (cGMPs and official compendium) ("A drug ... is adulterated ... (a)(2)(B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of the [federal] Act as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess; or
…(b) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from or its quality or purity falls below the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the Federal Act.").

• **Maryland Code, Health–General §§ 21-216(c)(6)(2), 21-256(1)** (cGMPs and official compendium): "For purposes of this subtitle, a drug … is adulterated if … (c)(6) It is purported to be a drug the name of which is recognized in an official compendium and: (i) The strength of the drug differs from, or the quality or purity of the drug falls below, the standard set in the official compendium; and (ii) The difference in strength, quality, or purity is not stated plainly on its label; or
(7) Although not purported to be a drug recognized in an official compendium, the strength of the drug differs from, or the quality or purity of the drug falls below that which the drug purports to possess. …
(d)(1) For purposes of administering subsection (c)(6) of this section, any determination as to whether the strength of a drug differs from or as to whether its quality or purity falls below the standard set in an official compendium shall be made in accordance with the tests or methods of assay set forth in the official compendium, or, in the absence of or inadequacy of those tests or methods of assay, those provided under the federal act."

• **Missouri Statutes § 196.095(5)** (official compendium): "A drug … shall be deemed to be adulterated: (5) If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under authority of the federal act."

• **Nevada Statutes § 585.380(1)** (official compendium): "1. A drug shall be deemed to be adulterated if it is represented as a drug, the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in the compendium. The determination as to strength, quality or purity must be made in accordance with the tests or methods of assay set forth in the compendium or, in the absence of or inadequacy of those tests or methods of assay, those prescribed pursuant to the Federal Act."

• **New York Education Law § 6815(b)** (official compendium): "A drug … shall be deemed to be adulterated: b. If it purports to be, or is represented as, a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or, in the absence or inadequacy of such tests or methods of assay, then in accordance with tests or methods of assay prescribed by regulations of the board of pharmacy as promulgated under this article[.]"

• **Ohio Code § 3715.52(A)(5)** (official compendium): "(A) A drug or device is adulterated … (5) It purports to be or is represented as a drug the name of which is recognized in the United States pharmacopoeia and national formulary, or any supplement to them, and its strength differs from or its quality or purity falls below the standard set forth in those compendiums. A determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in the compendiums, or in the absence or inadequacy of such tests or methods of assay, those prescribed under the authority of the 'Federal Food, Drug, and Cosmetic Act.'"

• **Title 35, Pennsylvania Statutes § 781(5)** (official compendium): "A drug shall be deemed to be adulterated within the meaning of this act:… 5. If the drug shall be so altered that the nature, quality, substance, commercial value or medicinal value of it will not correspond to the recognized formulae or tests of the latest edition of the "National Formulary," or of the "Pharmacopoeia of the United States," or the American Homeopathic Pharmacopoeia, or the American Homeopathic Dispensatory, regarding quality or purity."

• **Washington Statute § 69.04.420** (official compendium): "If a drug or device purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium, it shall be deemed to be adulterated. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium or prescribed by regulations promulgated under section 501(b) of the federal act."

• **Texas Health & Safety §§ 431.111(a)(2)(B), (b)** (cGMPs and official compendium): "A drug … shall be deemed to be adulterated: … (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess; or

… (b) if it purports to be or is represented as a drug, the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standards set forth in such compendium. Such determination as to strength, quality or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, or in the absence of or inadequacy of such tests or methods of assay, those prescribed under the authority of the federal Act."

## XI. Injuries to Plaintiffs and Class Members

174. When Plaintiffs purchased Defendants' BPO Products, they did not know, and had no reason to know, that the Products contained and/or could

degrade into the potentially harmful carcinogen benzene. Not only would Plaintiffs not have purchased, or paid less for, Defendants' BPO Products had they known the Products contain and/or degrade to form benzene, rendering them misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce, but they would also not have been capable of purchasing the Products if Defendants had done as the law required and tested the Products for benzene.

175. Consumers lack the ability to independently verify whether a product contains unsafe substances like benzene, especially at the point of sale, and must rely on Defendants to truthfully and accurately report product contents on labeling, packaging, and its website. The specific manufacturing records, batch-level testing results, and internal stability protocols required by 21 C.F.R. § 211.166 are within the exclusive possession and control of Defendants. Because drug manufacturers are largely self-regulated, Plaintiffs lack pre-discovery access to the specific batch numbers and quality control logs that would identify which specific lots were released in violation of cGMPs. However, because the chemical instability of BPO is a systemic property of the product line, Plaintiffs allege upon information and belief—supported by the independent testing—that discovery will reveal the specific batches purchased by Plaintiffs were adulterated with benzene at the time of sale.

176. Given Defendants' position as a leader in the acne treatment market, Plaintiffs and Class members trusted and relied on Defendants' representations and/or omissions regarding its BPO Products.

177. Here, Defendants' misrepresentations and/or omissions were material. Plaintiffs and Class members made purchasing decisions based on Defendants' advertising and representations, including representations and/or omissions on the BPO Products' labeling with respect to the ingredients, warnings, and other information contained therein. The decision to purchase—or avoid—products containing benzene is a personal financial and healthcare decision, and it is reasonable for consumers to be concerned about potential carcinogens in the products they use.

178. Furthermore, Defendants' failure to comply with legal testing requirements prevented them from making an informed purchase.

179. Plaintiffs and Class members have been denied the opportunity to make such informed financial and healthcare decisions due to the Defendants' misconduct, and instead unwittingly purchased and used BPO Products they would have not have otherwise purchased, or paid less for, absent Defendants' misconduct. Plaintiffs and the Class members' injuries are therefore traceable to Defendants' acts and/or omissions.

180. As alleged, Defendants' false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the BPO Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class members.

181. Plaintiffs and Class members bargained for products free of contaminants and dangerous substances, which are legally permissible to sell under parallel state and federal law. Plaintiffs and Class members were injured by the full purchase price of the BPO Products because the Products are worthless. Specifically, the BPO Products are misbranded, adulterated with harmful levels of benzene, and thus illegal to sell, yet Defendants failed to warn consumers of this fact. Alternatively, Plaintiffs and Class members are entitled to the difference in value between the Products as bargained for and the misbranded/adulterated Products they received.

## CLASS ALLEGATIONS

182. Plaintiffs, individually and on behalf of all others similarly situated, bring this class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3). Plaintiffs seek to represent Classes defined as:

**Multi-State Class**

All consumers who purchased Neutrogena and/or Clean & Clear benzoyl peroxide products in the United States of America and its territories from March 8, 2020 to the

present for personal or household use within the applicable limitations period.

183. In the alternative, Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure in the following state Subclasses:

**California Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of California from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Illinois Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of Illinois from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Maryland Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of Maryland from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Missouri Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of Missouri from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Nevada Subclass**

All persons who purchased Neutrogena and/or Clear &

Clear benzoyl peroxide products in the State of Nevada from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**New York Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of New York from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Ohio Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of Ohio from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Pennsylvania Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of Pennsylvania from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Washington Subclass**

All persons who purchased Neutrogena and/or Clear & Clear benzoyl peroxide products in the State of Washington from March 8, 2020, to the present for personal or household use within the applicable limitations period.

**Texas Subclass**

All persons who purchased Neutrogena and/or Clear & Clear peroxide products in the State of Texas from March 8, 2020, to the present for personal or household use within the applicable limitations period.

184. Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entities in which Defendants or its parents and any entities in which Defendants have a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the BPO Products.

185. Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

186. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains hundreds of thousands of members based on publicly available data. The Class is ascertainable by records in Defendants' possession.

187. *Commonality*: Questions of law or fact common to the Class include:

a. Whether the BPO Products contain benzene;

b. Whether a reasonable consumer would consider the presence of benzene in the BPO Products to be material;

c. Whether Defendants knew or should have known that the BPO Products contains benzene;

d. Whether Defendants misrepresented the BPO Products contain or degrade into benzene;

e. Whether Defendants failed to disclose that the BPO Products contain or degrade into benzene;

f. Whether Defendants concealed that the BPO Products contain or degrade into benzene;

g. Whether Defendants engaged in unfair or deceptive trade practices;

h. Whether Defendants violated the state consumer protection statutes alleged herein;

i. Whether Defendants breached the implied and/or express warranties of merchantability;

j. Whether Defendants were unjustly enriched;

k. Whether the Plaintiffs and the Class members have been injured and if so, what is the proper measure of damages;

l. Whether the Plaintiffs and the Class members have the right to economic damages including compensatory, exemplary, and statutory remedies for Defendants misconduct; and

m. Whether the Plaintiffs and the Class members have the right to injunctive, declaratory, or other equitable relief and attorneys' fees.

188. *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendants relating to the same course of conduct, and are entitled to relief under the same legal theories.

189. *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

190. *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management

difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

191. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## COUNT I

**(Violations of the Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200, *Et Seq., Individually and on Behalf of the California Subclass*)**

192. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

193. Plaintiffs bring this cause of action on behalf of themselves, and all members of the California Subclass, all of whom are similarly situated consumers.

194. California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq*., prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or misleading advertising." Defendants regularly transact business in California, including in this District, and have engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

195. Defendants misrepresented its BPO Products in advertising, labels, and containers and misled Plaintiffs, the Subclass, and the public about the

ingredients, characteristics, purity, quality, approval, and safety of the Products. Defendants led Plaintiffs, the Subclass, and the public to believe the BPO Products were safe and had characteristics, purity, and quality that the Products did not have.

196. Defendants' advertising, online representations, labeling, and packaging of the BPO Products were misleading, fraudulent, and deceptive. Defendants knew through the Products' development, formulation, research, and pre-sale safety and stability testing, the Products were not chemically and physically stable when exposed to common temperature conditions. Defendants knew or should have known the Products formulated benzene under normal and expected consumer use, handling, and storage conditions, and that consumers would be exposed to benzene. Defendants were specifically reminded by the FDA of their obligation to ensure the safety and quality of its BPO Products, including testing them for benzene before selling them to the public, but shirked their duties and continued to market and sell the Products without substantiating their safety, or warning Plaintiffs, the Class, and the public about benzene.

197. Defendants omitted material health and safety information (e.g. the presence of benzene) from the Products' advertising, label, container, and warnings. Defendants did not tell Plaintiffs and the Class members they would be

exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' container closed.

198. Defendants' acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about what ingredients and potential contaminants are contained in BPO Products. Reasonable consumers certainly expect that known human carcinogens in the Products be disclosed. Reasonable consumers further expect drugs to be free of known human carcinogens, unless told otherwise. That benzene is contained in a widely marketed drug product used by children, teens, adults and the public in general is material health information reasonable consumers expect to be told.

199. Had Defendants been truthful in their advertising, labeling, packaging, and online statements about benzene in the BPO Products, or the risk that such Products would degrade into benzene, Plaintiffs and the Subclass members would not have bought the Products, or paid less for them.

200. Defendants' acts, omissions, and/or concealment of material health and safety information are ongoing and continuing to cause harm. Defendants continued to market, advertise, and sell the Products to the public without telling the public about benzene in the Products and/or the fact that the Products could degrade to form benzene. Defendants continued to market themselves as responsible drug manufacturers and sellers who sell safe products when they have

not tested the Products for benzene or quantified the levels of benzene formed in the Products during normal and expected storage conditions.

201. Defendants engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the Subclass members, and not outweighed by any benefit. Omitting and/or concealing material human health and safety information such as benzene in the BPO Products and the consumers' risk of harm from using the Products is unethical, unscrupulous, and offensive.

202. Defendants sold adulterated and misbranded BPO Products in violation of CAL. BUS. & PROF. CODE § 17200, *et seq*.

203. Plaintiffs and the Class members suffered ascertainable economic losses because of Defendants' misconduct because they bought the Products they would otherwise would not have bought, or paid less for, but for Defendants' misrepresentations and/or affirmations of safety.

204. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, and the California Subclass, seek recovery of their economic damages, attorneys' fees, restitution, and all other relief allowable under CAL. BUS. & PROF. CODE § 17200, *et seq*., including an injunction to enjoin Defendants from continuing their fraudulent and deceptive business practices. The damages sought

are ascertainable, uniform to Plaintiffs and the Subclass, and can be measured and returned to the Subclass members.

**COUNT II**

**(Violations of the Consumers Legal Remedies Act (the "CLRA"), Cal. Bus. & Prof. Code § 1750, *Et Seq., Individually and on Behalf of the California Subclass*)**

205. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

206. Plaintiffs bring this cause of action on behalf of themselves, and the California Subclass members, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

207. Defendants' acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendant. Defendants regularly transact business in California, including in this District, and have engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

208. California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*. prohibits unfair methods of competition and unfair or deceptive acts

or practices in connection with the sale of consumer goods. Defendants violated several prohibitions of CIV. CODE § 1750(a).

209. Defendants violated CAL. CIV. CODE § 1750(a)(2) by representing (1) the source, sponsorship, and approval, of the BPO Products (*e.g*., the Products were "always backed by science"), (2) that Defendants met its obligations to conduct adequate and meaningful quality and safety testing before selling the Products to the public, and (3) the Products only contained the active and inactive ingredients listed, and were free of defects (i.e. known human carcinogens).

210. Defendants violated CAL. CIV. CODE § 1750(a)(3) by representing the affiliation, connection, or association with, or certification by, another (*e.g*., that the BPO Products were approved by dermatologists and manufactured in conformity with cGMPs.

211. Defendants violated CAL. CIV. CODE § 1750 (a)(4) by using deceptive representations (*e.g*., that the Products were pure, of good quality, safe, validated, only contained the active and inactive ingredients disclosed, supported by the latest research, and free from latent defects such as benzene).

212. Defendants violated CAL. CIV. CODE § 1750(a)(5) by representing the Products have characteristics, ingredients, uses, or benefits, which they do not (*e.g*., misleading Plaintiffs and the Class members that the BPO Products only

contained the listed active and inactive ingredients, did not contain latent defects (i.e. benzene), and did not increase the risk of harm from using the Products).

213. Defendants violated CAL. CIV. CODE § 1750(a)(6) by representing the Products were not deteriorated unreasonably or altered (*e.g*., that the Products were pure and did not contain benzene and/or degraded to form benzene).

214. Defendants violated CAL. CIV. CODE § 1750(a)(7) by representing the Products were pure and of a particular standard or quality, when they are not.

215. Defendants violated CAL. CIV. CODE § 1750(a)(9) by advertising the Products with the intent not to sell them as advertised (*e.g*., that the Products were of pure quality, safe, made in conformity with cGMPs, and not adulterated).

216. Thus, Defendants sold adulterated and misbranded BPO Products in violation of CAL. CIV. CODE § 1750.

217. Had Defendants been truthful in their advertising, labeling, packaging, warnings, and online statements about benzene in the BPO Products and the risk inherent therein, Plaintiffs and the California Subclass members would not have bought the Products, or paid less for them. That benzene, a known human carcinogen, was present in a widely marketed and available consumer drug product, is material health and safety information Defendants knew Plaintiffs, the Subclass members, and the public would want to know. The Defendants' omission of this material information was common to Plaintiffs and all Subclass members

and was made to Plaintiffs and all Subclass members uniformly through common advertising, online representations, labeling, and packaging.

218. Defendants' acts, omissions, and concealment of material health and safety information are ongoing and continue to cause harm. Defendants continues to market, advertise, and sell the BPO Products to the public without telling the public about the presence of benzene in the Products and the risks inherent therein. Further, Defendants continues to market themselves as a responsible drug manufacturer and seller who sells safe products when they have not quantified the levels of benzene contained in and/or created in the Products during normal and expected storage conditions.

219. Defendants engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the California Subclass members, and not outweighed by any benefit. Omitting and/or concealing material human health and safety information such those presented by exposure to benzene in the BPO Products is unethical, unscrupulous, and offensive.

220. Plaintiffs and the California Subclass members suffered ascertainable economic losses as a result of Defendants' misconduct because they bought BPO Products they would not have otherwise bought, or paid less for, but for Defendants' misrepresentations.

221. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves and the California Subclass seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable under CAL. CIV. CODE § 1750, *et seq*., including an injunction to enjoin Defendants from continuing its fraudulent business practices. The damages sought are ascertainable, uniform to the Subclass and can be measured and returned to the Subclass members.

**COUNT III**

**(False Advertising Under Various State Statutes, *Individually and on Behalf of the California and New York Subclass*)**

222. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

223. Plaintiffs bring this cause of action on behalf of themselves, and all members of the California and New York Subclasses, all of whom are similarly situated consumers.

224. Defendants develops, tests, selects, markets and/or sells the BPO Products throughout the United States in its stores and through e-commerce websites. Defendants knew through the Products' development, formulation, and selection that the Products were not chemically stable when exposed to certain expected and normal environmental and storage conditions and formed benzene, as a toxic byproduct. Despite this knowledge, Defendants did not mention benzene in

the Products' advertising, ingredient lists, labels, containers, or warnings. Defendants did not tell Plaintiffs or Subclass members they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' containers closed.

225. That benzene, a known human carcinogen, is present in the BPO Products is material health and safety information Defendants knew Plaintiffs, and the Subclass members would want to know. Defendants not only omitted this material human health and safety information from advertising, online representations, blogs, labeling, packaging, and warnings, but aggressively marketed itself as a consumer conscious, market leader, company committed to consumer safety. Defendants' brand notoriety, market share, and affirmations of safety misled Plaintiffs, and the Subclass members, leading them to believe the BPO Products were tested, verified, and safe. Defendants further marketed the BPO Products by touting the approval of dermatologists, who were not aware of the presence of benzene in the Products. In doing so, Defendants omitted from its marketing any reference to the fact that it refused or failed to conduct adequate and meaningful testing before marketing and selling the Products to the public, even after the FDA's 2022 alert "remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to

assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications."

226. Defendants' acts and/or omissions constitute false advertising. Defendants advertised the BPO Products with the intent not to sell them as advertised. Reasonable consumers, including Plaintiffs and the Subclass members, exposed to Defendants advertising would believe the Products were safe, verified, and free of benzene.

227. Defendants' false and misleading advertising violated California's False Advertising Law, Bus. & Prof. Code § 17500 *et seq*., which prohibits Defendants from disseminating statements "which are untrue or misleading, and which are known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Defendants knew or should have known the BPO Products contained benzene and/or formed benzene under normal, handling, use, and storage conditions, but did not disclose this to Plaintiffs and the Class and Subclass members. Defendants also knew or should have known the BPO Products were not chemically stable when exposed to certain normal and expected environmental conditions.

228. Defendants' false and misleading advertising violated New York's General Business Law § 350 et seq. ("GBL § 350"), which prohibits "[f]alse advertising in the misconduct of any business, trade or commerce or in the

furnishing of any service" in New York. Under GBL § 350; "false advertising" includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect." Defendants violated GBL § 350 by advertising and selling the BPO Products without disclosing material health and safety information (*e.g.*, that the products contain benzene and/or degrade to form benzene and the risks inherent therein). Defendants' false and misleading advertising was directed at consumers, the New York Subclass members, and the public, and caused consumer injury and harm to the public interest.

229. Had Defendants been truthful in their advertising, online representations, labeling, and packaging about benzene, Plaintiffs, and the Subclass members would not have bought the BPO Products, or would have paid less for them.

230. Plaintiffs, on behalf of themselves, and the California and New York Subclass members suffered ascertainable economic losses because of Defendants' misconduct when they bought BPO Products they otherwise would not have but for Defendants' material misrepresentations.

231. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, and the California and New York Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendants from

continuing their fraudulent business practices. The damages sought are ascertainable, uniform, and can be measured and returned to the Subclass members.

## COUNT IV

**(Deceptive Trade Practices Under Various State Statutes, *Individually, and on Behalf of the Nationwide Class and the California, Illinois, Maryland, Missouri, Nevada, New York, Ohio, Pennsylvania, Washington, and Texas Subclasses*)**

232. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

233. Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and all members of the California, Illinois, Maryland, Missouri, Nevada, New York, Ohio, Pennsylvania, Washington, and Texas Subclasses, all of whom are similarly situated consumers.

234. Defendants' acts and omissions constitute deceptive business practices in violation of state deceptive trade practices laws.

235. Defendants represented the BPO Products had characteristics, uses, and benefits, they did not have. For example, Defendants represented the BPO Products were pure, of good quality, safe, and only contained the active and inactive ingredients disclosed.

236. Defendants represented the BPO Products were not deteriorated or altered, when they knew, or should have known, the BPO Products contain

benzene and/or degrade to form benzene under normal and expected use, handling, and storage conditions.

237. Defendants advertised the BPO Products with the intent not to sell them as advertised.

238. Defendants' acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendant.

239. Defendants' acts and omissions violated Illinois' Consumer Fraud and Deceptive Business Practices Act ("ICFA") , 815 ILCS 505/1 *et seq*. Defendants used deception, fraud, false pretense, false promises, and omitted material health and safety information about the BPO Products' containing benzene and/or degrading into benzene, and/or contamination with benzene, which Defendants intended the Illinois Subclass members to rely upon, in violation of the ICFA.

240. Defendants' acts and omissions violated Maryland's Unfair or Deceptive Trade Practices Act, MD. COM. CODE, Title 13, Subtitle 3, §13-301 because Defendants: (1) represented the BPO Products had characteristics, ingredients, uses, and benefits, they did not; (2) represented the Products were not deteriorated or altered, when they were; (3) represented the Products were of a particular standard or quality, when they were not. Defendants' representations

about the Products' ingredients and/or omission of the presence of benzene in the Products were misleading, deceptive, incomplete, and not truthful, in violation of Maryland's Unfair or Deceptive Trade Practices Act.

241. Defendants' acts and omissions violated the Missouri Merchandising Practices Act, MO. REV. STAT. § 407, *et seq*., which prohibits the use of deception, fraud, misrepresentations, or unfair practices by a business—for example, marketing the BPO Products as safe, approved, tested, and only containing the listed ingredients. Missouri's law further prohibits the suppression or omission of material facts such as the BPO Products' containing benzene and/or degrading into benzene.

242. Defendants' acts and omissions violate Nevada Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52, Chapter 598 *et seq*., which prohibits Defendants from making false statements about its BPO Products and advertising the Products without the intent to sell them as advertised.

243. Defendants' acts and omissions violated N.Y. GEN. BUS. LAW § 349, which prohibits Defendants from engaging in deceptive, unfair, and misleading acts and practices such as those committed by Defendants and alleged in this class action. Defendants' misrepresentations and omissions caused consumer injury and harm to the public interests of protecting public health and the public's right to know about any harmful constituents in the BPO Products.

244. Defendants' acts and omissions violated Ohio's Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01, et seq. which prohibits sales practices that are deceptive, unfair, or unconscionable, and Ohio's Deceptive Trade Practices Act, OHIO REV. CODE ANN.§ 4165 *et seq*., which prohibits a person from (1) representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, (2) representing that goods are of a particular standard, quality, or grade, if they are of another, and (3) advertising goods with intent not to sell them as advertised.

245. Defendants' acts and omissions violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 et seq. because Defendant: (1) caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the BPO Products; (2) used deceptive representations about the Products; (3) represented the Products had characteristics, ingredients, or benefits, they did not; (3) represented the Products were not deteriorated or altered, when they were; (4) represented the Products were particular standard or quality when they are not; and (5) advertised the Products with the intent not to sell them as advertised.

246. Defendants' acts and omissions violated Texas's Unfair Trade Practices and Consumer Protection Law, Tex. Bus. & Com. Code § 17.41, et seq., which broadly protects (1) consumers; (2) from a Defendants' false, misleading,

or deceptive acts; (3) that caused the consumer's damage. Defendants from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Defendants' concealment of material health and safety information about the BPO Products, which they knew or should have known, was injurious to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products. Defendants' conduct caused harm to the Plaintiffs, the Texas Subclass members, and members of the public who bought the Products without knowing they contain benzene and/or degrade into benzene.

247. Defendants' acts and omissions violated Washington's Consumer Protection Act, WASH. REV. CODE § 19.86.010, et seq., which broadly prohibits Defendants from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.[123] Defendants' concealment of material health and safety information about the BPO Products, which they knew or should have known, was injurious to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products. Defendants' conduct caused harm to the Plaintiffs, the

[123] Under § 19.86.090, Washington consumers harmed by such practices may recover actual damages, the costs of the suit, including reasonable attorney's fees, and the court may, in its discretion, increase the award of damages to an amount up to three times the actual damages sustained.

Washington Subclass members, and members of the public who bought the Products without knowing they contain benzene and/or degrade into benzene. Defendants' conduct has the capacity to cause harm to other persons who buy the Products.

248. Had Defendants been truthful in their advertising, labeling, and packaging of the BPO Products and not omitted material health and safety information about the presence of benzene and/or the Product degrading into benzene, Plaintiffs, the Class, and Subclass members would not have bought the Products.

249. Defendants' acts and omissions and violations of the state consumer protection statutes are ongoing and continuing to cause harm.

250. Defendants have received formal written notice of its violations of these statutes and other applicable laws by and through the filing of *Navarro et al. v. Defendants, Inc.*, Case No. 1:24-cv-002880JLT-SAB (E.D. Cal.) on March 8, 2024, and additional actions filed throughout the country related to Defendants' sale of BPO Products. Formal notice letters have also been issued to Defendants on behalf of Plaintiffs and the proposed Classes.

251. Plaintiffs, on behalf of themselves and the Subclasses, suffered an ascertainable economic loss as a result of Defendants' misconduct when they

purchased the Products—Products they would not have purchased but for Defendants' misrepresentations.

252. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, and the state Subclasses seek recovery of their economic damages, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are ascertainable, uniform and can be measured and returned.

## COUNT V

**(Breach of Implied Warranty of Merchantability, *Individually, and on Behalf of the Nationwide Class and the California, Maryland, Missouri, Nevada, Pennsylvania, and Texas Subclasses*)**

253. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

254. Plaintiffs bring this cause of action individually and on behalf of (1) all consumers who purchased BPO Products directly from Defendants (for which there is privity), (2) all consumers whose state law has abrogated the privity requirement for implied warranty of merchantability claims seeking economic loss, and (3) all California Subclass members.

255. Defendants impliedly warranted that its BPO Products were merchantable, fit and safe for ordinary use.

256. Under California law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

257. A "merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." Cal. Com. Code § 2104(1).

258. Defendants are a "merchant" within the meaning of Cal. Com. Code § 2104(1).

259. "Goods" includes "all things (including specifically manufactured goods)[.]" Cal. Com. Code § 2105(1). The BPO Products are "goods" under the California Code.

260. To be merchantable the goods, among other things, must be (1) "fit for the ordinary purposes for which such goods are used" and (2) "adequately contained, packaged, and labeled[.]" Cal. Com. Code § 2314(2)(c), (e). Defendants have violated these implied warranties.

261. First, because the BPO Products contain benzene and/or degrade to form benzene, including at levels that exceed the FDA's safe harbor exception, they are not fit for the ordinary purposes for which such Products are used.

262. Indeed, the levels of benzene contained in the BPO Products have been indisputably linked to negative health consequences.[124]

263. Second, as alleged, the BPO Products were not adequately labeled because they did not disclose that they contain benzene and/or degrade into benzene.

264. California recognizes an exception to the privity requirement in breach of implied warranty claims pertaining to drug products where the products are unfit for human consumption or use. In California, implied warranties run with drugs to the ultimate consumer. As noted, the warranty here is that the drug is merchantable, fit, and safe for its intended purpose—that is, for human use or application as an acne treatment product.

265. Plaintiffs and members of the Class purchased the BPO Products in reliance upon the fact that the Products were merchantable, fit, and safe for ordinary use for which they were sold. They were not. The defect in the BPO Products (i.e. the presence of benzene) render the Products unfit for human use or

[124] CDER Health Hazard Evaluation, July 8, 2021, available at https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

application as an acne treatment product. As such, Plaintiffs meet the drug exception to the privity requirement recognized in California.

266. Moreover, the BPO Products were not altered by Plaintiffs or members of the Class; Plaintiffs and members of the Class were foreseeable users of the BPO Products; and Plaintiffs and members of the Class used the BPO Products in the manner intended.

267. In sum, the BPO Products did not measure up to the promises or facts stated in the labeling, written literature, media advertisements and communications by and from Defendant.

268. Defendants sold adulterated and misbranded BPO Products in breach of their implied warranties.

269. Contrary to Defendants' implied warranties, the BPO Products were defective, unmerchantable, and unfit for their ordinary use when sold.

270. By reason thereof, Plaintiffs and the other Class members have suffered damages in an amount to be proven at trial.

## COUNT VI

**(Negligent Misrepresentation/Omission, *Individually and on Behalf of the Nationwide Class and the Subclasses)***

271. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

272. Plaintiffs bring this claim individually, on behalf of the Nationwide Class and Subclasses.

273. Through its labeling and advertising, Defendants made representations to the Plaintiffs and the Class members concerning the quality, safety, and purity characteristics of its BPO Products.

274. Defendants had a common law duty to provide accurate and non-misleading information to consumers with respect to the quality, safety, and purity characteristics of its BPO, including defects, and to not omit such material quality, safety, and purity characteristic information. More specifically, Defendants had the duty and obligation not to sell products that were adulterated with benzene. This duty existed independently from any contractual obligations between the parties.

275. Defendants breached its duty to accurately disclose in its labeling and advertising that the BPO Products contain benzene and/or degrade into benzene.

276. As a manufacturer, Defendants also had a common law duty (and a duty under appliable drug safety laws) to use reasonable care in the design and manufacture of its BPO Products, including the duty to perform reasonable tests and inspections of its Products to discover latent defects (such as the presence of benzene). This duty existed independently from any contractual obligations between the parties.

277. Defendants are an expert in the field who had exclusive knowledge of the defect (i.e. benzene) that gave rise to the duty to disclose. Conversely, Plaintiffs are unsophisticated consumers who do not have the same level of sophistication or knowledge or access to the same information regarding defects as the Defendants manufacturer.

278. Defendants breached its duty to perform reasonable tests and inspections of its BPO Products for latent defects (i.e. the presence of benzene) prior to selling those Products to consumers such as Plaintiffs and Class members.

279. Defendants had a common law duty to not make false representations or deceive consumers with respect to its BPO Products. This duty existed independently from any contractual obligations between the parties.

280. Defendants breached its duty when it made false representations regarding the quality, safety, and purity characteristics about its BPO Products.

281. Defendants breached their duty when they sold adulterated and misbranded BPO Products to consumers.

282. Such failures to disclose on the part of Defendants amount to negligent omission and the representations regarding the quality, safety, and purity characteristics of the BPO Products amount to negligent misrepresentation.

283. Plaintiffs and the other Class and Subclass members reasonably relied upon all such representations and omissions to their detriment.

284. Moreover, Plaintiffs were foreseeable victims of Defendants' misconduct. Defendants knew or should have known that manufacturing and selling BPO Products containing benzene rendered the Products adulterated and/or misbranded under state law and, thus, illegal to sell, and that Plaintiffs would suffer the very financial loss which ultimately occurred.

285. Defendants' breaches of its duties were a direct and proximate cause of the economic harms to Plaintiffs and the California, Illinois, Maryland, Missouri, Nevada, New York, Ohio, Pennsylvania, Washington, and Texas Subclass members.

286. By reason thereof, Plaintiffs and the other Class and subclass members have suffered damages in an amount to be proven at trial.

## COUNT VII

**(Unjust Enrichment/Quasi-Contract,[125] *Individually and on Behalf of the Nationwide Class and the Subclasses*)**

287. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

[125] In California, there is not a standalone cause of action for "unjust enrichment," so California courts may "construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). The California subclass seeks to have this claim construed as a quasi-contract claim seeking restitution consistent with California law.

288. Plaintiffs bring this cause of action individually and on behalf of the nationwide Class and the California, Illinois, Missouri, Nevada, New York, Ohio, Pennsylvania, Washington, and Texas Subclasses.

289. Defendants enticed Plaintiffs to purchase its BPO Products through false and misleading labeling that the Products were merchantable, fit and safe to use. They were not. Instead, the BPO Products were adulterated with benzene and/or degraded to form benzene at excessive levels, rendering the Products unfit and unsafe and illegal to sell.

290. Defendants were unjustly enriched through the sale of misbranded and adulterated BPO Products.

291. Defendants have unjustly profited from its deceptive business practices and kept the profits from Plaintiffs and the Class and Subclass members who purchased the BPO Products.

292. Defendants requested and received a measurable economic benefit at the expense of Plaintiffs, the Class, and Subclass members as payment for the BPO Products. Defendants accepted the economic benefits from Plaintiffs, the Class, and Subclass members knowing the economic benefit received was based on deception and omission of material human health and safety information.

293. There is no utility in Defendants' misconduct and Defendants' enrichment from the misconduct is unjust, inequitable, unconscionable, and against the strong public policy to protect consumers against unlawful conduct.

294. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, and the public, seek recovery of their actual damages, disgorgement of profits, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendants' BPO Products.

**COUNT VIII**

**(Breach of Express Warranty, *Individually and on Behalf of the Nationwide Class and the Subclasses)***

295. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

296. The Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise. Defendants advertised and sold the Products as safe, pure, of good quality, and only containing the listed ingredients. Defendants' advertising, labels, containers, packaging, advertising, and online statements did not mention benzene, leading consumers to believe the Products were safe for their

ordinary use. Defendants' affirmations were uniformly made to Plaintiffs and the Class members by Defendants in the Products' advertising, labeling, packaging, and online statements and were part of the basis of the bargain between Defendants, the Plaintiffs, the Class, and Subclass members.

297. Defendants' affirmations and promises are unlawful. When Defendants marketed, distributed, and sold the Products, Defendants knew, or should have known, the Products degraded to benzene under normal and expected use, handling, and storage conditions. Defendants knew, or should have known, the Products formed benzene and therefore did not conform to Defendants' express representations and warranties to consumers. Plaintiffs, the Class, and Subclass members purchased the Products in reasonable reliance on Defendants' statements.

298. Defendants breached their express warranties in the sale of misbranded and adulterated BPO Products to consumers.

299. Because of Defendants' misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendants from continuing their fraudulent business practices. The damages sought are ascertainable, uniform to the Class and Subclasses and can be measured and returned.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A. An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendants to bear the costs of Class notice;

B. An order enjoining Defendants from selling the BPO Products;

C. An order enjoining Defendants from suggesting or implying that they are safe for human application;

D. An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing BPO Products;

E. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F. An order requiring Defendants to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or

practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G. An order requiring Defendants to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of any wrongful or unlawful act or practice;

H. An order requiring Defendants to pay all actual and statutory damages, including, where available, punitive damages (*e.g*. Mo. St. 407.025(2)(1), 815 ILCS 505/10a), permitted under the counts alleged herein;

I. An order awarding attorneys' fees and costs to Plaintiffs and the Class; and

J. An order providing for all other such equitable relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

300. Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 30, 2026

Respectfully submitted,

*/s/ Philip L. Fraietta*

Philip L. Fraietta
**BURSOR & FISHER**
50 Main St., Suite 475
White Plains, NY 10606
Tel: 914-874-0708

Fax: 914-206-3656
pfraietta@bursor.com

Nick Suciu III (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Email: nsuciu@milberg.com

R. Brent Wisner, Esq. (*pro hac vice*)
**WISNER BAUM, LLP**
100 Drakes Landing Rd., Suite 160
Greenbrae, CA 94904
Telephone: (310) 207-3233
Facsimile: (310) 820-7444
rbwisner@wisnerbaum.com

*Interim Co-Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 30, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

Respectfully Submitted,

*/s/ Philip L. Fraietta*

Philip L. Fraietta
**BURSOR & FISHER**
50 Main St., Suite 475
White Plains, NY 10606
Tel: 914-874-0708
Fax: 914-206-3656
pfraietta@bursor.com